**In re Daniel L. JUNK and Christine H. Junk, Debtors.**

**Daniel L. Junk, et al., Plaintiffs,**

**v.**

**CitiMortgage, Inc., et al., Defendants.**

**Bankruptcy No. 13–55139.**

**Adversary No. 13–2390.**

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division,
at Columbus.

Signed July 2, 2014.

Kristin Radwanick, Columbus, OH, for Debtors.

*MEMORANDUM OPINION AND OR-
DER ON (A) MOTION OF CITI-
MORTGAGE, INC. FOR RELIEF
FROM THE AUTOMATIC STAY
AND (B) MOTIONS FOR DISMISS-
AL OF, OR ABSTENTION FROM,
ADVERSARY PROCEEDING*

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

## I. Introduction

For several years, Daniel and Christine Junk have been engaged in foreclosure litigation that began after they stopped making payments on their mortgage note and then attempted to quiet title to their South Carolina home in themselves. While the litigation was pending in South Carolina's state court system, the Junks moved to Ohio, where they commenced a Chapter 11 bankruptcy case and an adversary proceeding in which they contend, as they have in state court, that the plaintiff in the foreclosure action is not entitled to enforce the note and has no enforceable mortgage on their real property. The foreclosure plaintiff, CitiMortgage, Inc., requests that the Court grant it relief from the automatic stay and abstain from hearing the adversary proceeding. The Junks oppose both requests.

For the reasons explained below, the Court grants CitiMortgage relief from stay in order to pursue a judgment regarding the property and abstains from hearing the adversary proceeding as to the issues to be decided by the state court. State law issues predominate over bankruptcy issues, the disputed property is located in South Carolina, and the courts of that state already have invested significant resources in the litigation between CitiMortgage and the Junks. Granting relief from stay and abstaining from deciding the issues to be decided by the state court will promote judicial economy, and litigating those issues in South Carolina should impose relatively few costs on creditors while not hindering the efficient administration of the estate. Finally, this appears to be a classic case of forum shopping by the Junks, who, after receiving one adverse ruling after another in the state court, are rehashing in this adversary proceeding the very same arguments they have made in South Carolina.

## II. Jurisdiction

The Court has jurisdiction to hear and determine the motions pending before it

pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(A), (G) and (O).

## III. Procedural Background

Before the Court are two motions filed by CitiMortgage, one for relief from the automatic stay under § 362(d) of the Bankruptcy Code ("Stay Relief Motion") (Doc. 77),[1] and another requesting that the Court dismiss this adversary proceeding or, in the alternative, abstain from hearing it ("Dismissal/Abstention Motion") (Adv. Doc. 214).[2] The Junks filed an opposition to the Stay Relief Motion (Doc. 87, supplemented by Doc. 89) and an opposition to the Dismissal/Abstention Motion (Adv. Doc. 261). In their opposition to the Stay Relief Motion ("Opp'n to Stay Relief"), the Junks stated that they "have filed an extensive Objection to [CitiMortgage's motion to dismiss or convert the Junks' bankruptcy case] and incorporate herein all of the arguments raised in that Objection." Opp'n to Stay Relief at 1 n. 1. The Junks' objection to CitiMortgage's motion to dismiss or convert ("Objection to Dismissal or Conversion") is located at Doc. 86.

CitiMortgage filed a reply in support of the Stay Relief Motion (Doc. 90), a reply in support of the Dismissal/Abstention Motion (Adv. Doc. 276) and a pre-hearing memorandum in support of both (Doc. 98).

The Court held a telephonic preliminary hearing on the Stay Relief Motion on March 20, 2014. The Court then held a final hearing on the Stay Relief Motion and a hearing on the Dismissal/Abstention Motion on May 14, 2014. By the order setting that hearing (Doc. 93 and Adv.

Doc. 291), the Court limited the scope of the hearing to: (a) oral argument and the presentation of evidence relevant to the factors that courts analyze in determining whether "cause" for relief from the automatic stay exists under § 362(d)(1) to permit a creditor to pursue litigation pending outside the bankruptcy court; and (b) oral argument on the Dismissal/Abstention Motion.

The Court also afforded all parties who had filed motions for dismissal or abstention in the adversary proceeding the opportunity to be heard on their motions. In addition, the parties agreed and the Court ordered that the automatic stay would remain in effect until the date on which the Court issued a ruling on the Stay Relief Motion and the Dismissal/Abstention Motion. The Court also stayed all discovery in the bankruptcy case and in the adversary proceeding pending the Court's decision on those motions.

The transcript of the May 14, 2014 hearing ("Tr.") is located at Adv. Doc. 305. During the hearing, the Court heard the testimony of Mr. Junk. Counsel for the Junks requested that testimony provided on the Stay Relief Motion also be applicable to the Dismissal/Abstention Motion, and the Court agreed that this would be appropriate given the overlap. Tr. at 144. Joint Exhibit ("J.E.") 1 through Joint Exhibit 48 were admitted into evidence without objection, and Exhibits 2 through 5 offered by the Junks likewise were admitted into evidence without objection. Rick Brunner, Susan Rhiel and Kaitlin Madigan appeared for the Junks. Michael Debbel-

---

1. References to documents filed in the Junks' bankruptcy case will be designated as "Doc.——" and references to documents filed in this adversary proceeding will be designated as "Adv. Doc.——."

2. Citi Master Servicing; Citibank, N.A.; MERSCORP Holdings, Inc., f/k/a MERSCORP, Inc.; Mortgage Electronic Registration Systems, Inc. ("MERS") and Jennifer Oakes also joined in the Dismissal/Abstention Motion.

er, Nathan Blaske and Jeffrey Rosenstiel appeared for CitiMortgage and the other entities that filed the Dismissal/Abstention Motion.

Numerous other attorneys appeared at the hearing, a circumstance explained by the approach to the litigation that the Junks have taken here and in the state court. As explained in more detail below, the Junks asserted claims in the state court foreclosure litigation against numerous persons and other entities that were in any way involved in their loan transaction. This included Danielle Sterling, the person who appears to have signed—on behalf of the payee of the note—an indorsement to CitiMortgage and an indorsement in blank.[3] During the hearing in this Court, Mr. Junk stated that he had alleged that Ms. Sterling was liable with the Junks on their $1.2 million mortgage note based on her having signed the indorsements, and that she had settled with the Junks—stating that, although she had the authority to sign the indorsements, she was not the one who signed them.

The state court ruled that the persons and other entities named by the Junks as third-party defendants did not need to be joined as parties in order for CitiMortgage and the Junks to obtain the relief they were seeking in the foreclosure action on their claims and counterclaims. Despite this ruling, with the notable exception of Ms. Sterling, the Junks have named as defendants in this adversary proceeding nearly every person and other entity that had any involvement—no matter how attenuated—with the loan transaction. The defendants appearing through counsel, together with their role in the loan transac-

tion and the documents they have filed, are listed below:

- Lawyers Title Insurance Company ("Lawyers Title"), which issued a lender's policy of title insurance on the mortgage loan and has filed a motion to dismiss (Adv. Doc. 160);

- Mayer Brown LLP, which the Junks contend acted as counsel to HSBC Bank in creating a trust ("HALO Trust") into which the note executed by the Junks allegedly was placed; the law firm has filed a motion to dismiss (Adv. Doc. 166);

- Nexsen Pruet, LLC, Andrea Easler, Edward Hughes and Colonial Coast Title Agency, Inc. ("Colonial Coast"), a law firm and attorneys who represented the Junks in connection with the loan closing and a company that issued a title policy; they have filed a motion to dismiss (Adv. Doc. 203);

- Nelson Mullins Riley & Scarborough LLP, Rush Smith, III, Brian Crotty and Michael Anzelmo, a law firm and attorneys who represented CitiMortgage and other parties in the foreclosure action; they have filed a motion to dismiss (Adv. Doc. 213);

- Riley Pope & Laney, LLC, Heidi Carey, Roy Laney and Lowndes Pope ("Riley Pope Defendants"), a law firm and attorneys that represented a servicer of the mortgage loan; they have filed a motion to dismiss or abstain (Adv. Doc. 230);

- Deutsche Bank National Trust Company as Trustee of HS1 Asset Loan Obligation Trust 2007–AR1, which the Junks allege was the trustee of the HALO Trust, Wells Fargo Bank, N.A.,

---

**3.** "Commentators and courts vary on whether 'endorsement' or 'indorsement' is the proper spelling." Draga L. Dubick, *Commercial Law*, 55 Maryland Law Review 529, 529 (1996). While either spelling may be consid-

ered correct, this opinion uses the spelling of the words "indorse," "indorser" and "indorsement" to conform to the spelling used in the Uniform Commercial Code, including South Carolina's version.

which the Junks contend was the custodian of the HALO Trust, and American Home Mortgage Servicing, Inc, fka AHM Mortgage Acquisition Co., Inc., nka Homeward Residential, Inc., which the Junks allege was the owner of the bank account where the loan funds were to be sent to pay off their prior loan; they have filed a motion for judgment on the pleadings (Adv. Doc. 234);

● Bayview Loan Servicing, Inc. ("Bayview"), an entity that serviced the mortgage loan and commenced the foreclosure action, and Robert Hall, one of its employees; they have filed a motion to dismiss or abstain (Adv. Doc. 238);

● HALO 2007–AR1, HSBC Bank USA, N.A., HSBC Securities, Inc. and HSI Asset Securitization Corporation; they have filed an answer to the complaint (Adv. Doc. 256).

Following the hearing, the Junks filed a document entitled "Bench Memoranda on SC Code § 36–3–308" (Adv. Doc. 301).

## IV. Factual Background

### A. Background Summary

In November 2006, the Junks issued a $1.2 million, 30–year mortgage note to American Home Mortgage. After making payments on the note for just a little over two years, the Junks stopped paying and took steps to be relieved of their mortgage obligation. The Junks first sent a written request for documents and information stating that the failure to respond would provide the Junks a power of attorney to act for American Home Mortgage; the Junks also sent a notice to CitiMortgage, the then-current servicer of the loan, purporting to rescind the note and mortgage. Mr. Junk then signed and filed documents with the recorder of Beaufort County, South Carolina stating that the mortgage

was released and satisfied and that the entire debt secured by the mortgage had been paid in full.

Later that year, the Junks commenced a state court lawsuit in Beaufort County seeking to quiet title to the property solely and forever in their names. At the time they filed the lawsuit, they had reason to believe that CitiMortgage was the owner of the loan and that Bayview had become its servicer. But instead of naming CitiMortgage and Bayview as defendants in the quiet title action, the Junks purported to serve them via publication as "John Doe" defendants. Bayview then commenced a foreclosure action against the Junks, alleging that the Junks owed nearly $1.2 million plus interest, taxes, insurance and costs. The judicial officer presiding over the quiet title action and the foreclosure action—the Honorable Marvin H. Dukes, the Beaufort County Master–in–Equity—found that CitiMortgage was not a proper John Doe defendant in the quiet title action, dismissed the quiet title action without prejudice to the Junks asserting claims in the foreclosure action and substituted CitiMortgage as the plaintiff in the foreclosure action in place of Bayview. He later dismissed a third-party complaint the Junks had filed in the foreclosure action against over 20 defendants for civil conspiracy and other alleged wrongdoing and dismissed with prejudice each of the counterclaims the Junks had filed against CitiMortgage in the foreclosure action.

As described in more detail below, accomplishing all this in the state court litigation took five hearings, several orders, and approximately two years, leaving only the counts asserted in the foreclosure complaint and the defenses asserted by the Junks to be decided by the Master–in–Equity. The Junks, though, filed multiple appeals, including an appeal of an order the appellate court had previously found to

be nonappealable, delaying the process of adjudicating whether CitiMortgage is entitled to a foreclosure judgment. Some of the appeals had been dismissed and others were yet to be decided when the Junks filed their bankruptcy petition. The Junks then commenced this adversary proceeding, in which they are making essentially the same arguments they were making in South Carolina in support of their position that the note and mortgage are unenforceable.

## B. Events Leading to the Litigation in South Carolina

Mr. Junk is a law school graduate who has never been licensed to practice law in any jurisdiction. While in law school, he worked at Simpson Thacher & Bartlett LLP in New York City. After graduating in 1997, he continued to work in the New York office of the Simpson Thacher law firm until the year 2000, when he left to take a position in the electronic discovery field. Tr. at 151–53; 221–24. In September 2005, Mr. Junk moved from New York to South Carolina. Tr. at 153. There is no evidence that the move was related to his employment; Mr. Junk commuted from South Carolina to New York for work after the move. Tr. at 153.

In September 2005, the Junks purchased a home located at 181 Oldfield Way in Okatie, Beaufort County, South Carolina ("Oldfield property") for $1.125 million. Tr. at 213–14. The Junks made a down payment of approximately $300,000,

borrowing the remainder of the purchase price and executing a note in the amount of $843,750 in favor of American Home Mortgage. Ex. 5 to J.E. 46;[4] Tr. at 156–57; 215. That same year they also borrowed additional money from a different lender to make approximately $200,000 in improvements to the home. Tr. at 156–57; 215. According to Mr. Junk, the home has five bedrooms and five and one-half bathrooms, contains over 4,500 square feet and is located in a gated community that may only be accessed with permission. Tr. at 201; 214.

In November 2006, the Junks refinanced the 2005 loans, executing a $1.2 million note in favor of American Home Mortgage. Tr. at 156–58, 232–33. The Junks also signed a mortgage dated November 3, 2006. Tr. at 232. A copy of a document matching that description was admitted as Joint Exhibit 33. The document named MERS as the mortgagee as nominee for American Home Mortgage and its successors and assigns. J.E. 33 at 1.

Although he concedes that the signature on a copy of the November 2006 mortgage that he was shown during the hearing "does look like a signature I've used," Tr. at 218, Mr. Junk was unwilling to concede that he had signed it. Tr. at 216–18.[5] But because the parties have not put into evidence any other mortgage signed by the Junks on November 3, 2006, the Court will refer to Joint Exhibit 33 as the "Mortgage."[6] Likewise, Mr. Junk was unwilling to concede that copies of a note that he

---

4. Joint Exhibit 46 is the complaint ("Complaint") that the Junks filed to commence this adversary proceeding.

5. He was unwilling to make this concession despite the fact that the text of the copy of a mortgage that the Junks alleged they executed on or about November 3, 2006 (and which they attached to the Complaint) appears to be identical to the one he was shown at the hearing. J.E. 46 ¶ 155.

6. The Court does so without deciding whether Joint Exhibit 33 is a copy of the mortgage signed by the Junks in November 2006. That issue—as well as all the other issues bearing on the enforceability of the Note and the Mortgage—are for the Master–in–Equity to decide.

was shown during the hearing are copies of the note he signed in November 2006. Tr. at 215–17.[7] A copy of the Note with an indorsement to CitiMortgage is attached to Joint Exhibit 8, which is a copy of the complaint commencing the foreclosure action in which CitiMortgage is the plaintiff. A copy of the Note with the indorsement to CitiMortgage and a copy with the blank indorsement are included in Joint Exhibit 32, which are copies of the proofs of claim filed by CitiMortgage. Then there is the copy of the Note attached as Exhibit 8 to the Complaint, which the Junks alleged they executed on or about November 3, 2006. J.E. 46 ¶ 154. Because the parties have not put into evidence any other note signed by the Junks on November 3, 2006, the Court will refer to these notes—the text of which appears to be identical—as the "Note."

The first payment on the Note was due January 1, 2007. Tr. at 253. The Mortgage states that the debt it secures (in the amount of $1.2 million plus interest) is due in full no later than December 1, 2036, making the Note a 30–year note. J.E. 33 at 2. The Mortgage also states that the Junks do "hereby mortgage, grant and convey to MERS (solely as nominee for [American Home Mortgage] and [American Home Mortgage's] successors and assigns) and to the successors and assigns of MERS, the following described property located in the County of Beaufort" and then states "see exhibit 'A' for legal description Parcel ID Number: R603 008 000 0061 000 which currently has the address of 181 Oldfield Way, Okatie, South Carolina 29909." J.E. 33. at 3.

The Mortgage was recorded in Beaufort County on November 9, 2006. J.E. 33.

The copy of the Mortgage that is Joint Exhibit 33 is certified by the Register of Deeds for Beaufort County as being a true copy of the document recorded on November 9, 2006 in Book Number 2472 (from pages 2001 to 2023) and as being 23 pages long. J.E. 33.

In March 2009, the Junks stopping making payments on the Note after doing so for only two years and a few months. Tr. at 254. That same month, the Junks sent a letter purporting to be a "qualified written request" under the Real Estate Settlement Procedures Act ("RESPA") with respect to the 2006 loan. Tr. at 158–59; Ex. 19 to J.E. 46. The letter was addressed to "CitiMortgage, Inc. Attn: Customer Research Team" and copied to the South Carolina Department of Consumer Affairs, The Honorable Joe Wilson–United States House of Representatives, and the Federal Trade Commission–Consumer Response Center. Mr. Junk testified that he also sent the letter to MERS and American Home Mortgage. Tr. at 159.

After making various requests for documents and other information over the course of the letter's 20 pages, the Junks included a sentence stating that:

> Power of Attorney: When American Home Mortgage, Inc. fails by not rebutting to [sic] any part of this RESPA REQUEST American Home Mortgage, Inc. agrees with the granting unto Daniel L. Junk and Christine H. Junk's unlimited Power of Attorney and any and all full authorization in signing and endorsing American Home Mortgage, Inc.'s name upon any instruments in satisfaction of the obligations of this RES-

---

**7.** He was unwilling to make this concession despite the fact that the text of the copy of a note that the Junks alleged they executed on or about November 3, 2006 (which they at- tached to the Complaint) appears to be identical to the one he was shown at the hearing. J.E. 46 ¶ 154.

PA REQUEST/Agreement or any agreement arising from this agreement. Ex. 19 to J.E. 46 at 22.

CitiMortgage responded with a letter stating that the Junks' letter did not meet the necessary elements of a qualified written request under RESPA. Ex. 20 to J.E. 46; Tr. at 159. Later in March 2009, the Junks sent a notice of claim and rescission purporting to rescind the November 2006 loan transaction and the Note and the Mortgage. Ex. 20 to J.E. 46; Tr. at 159. The Junks received no response to that notice. Tr. at 159–60.

In April 2009, Mr. Junk—asserting that he was an agent of American Home Mortgage—signed and filed a document with the Beaufort County recorder stating that it was a satisfaction of mortgage and that the Mortgage was released and satisfied in full. J.E. 34; Tr. at 160, 221–22. The satisfaction of mortgage stated that the mortgage being released was dated November 3, 2006; that it was executed by Daniel and Christine Junk; that the mortgagee was American Home Mortgage; that the mortgage was filed of record in Book 2472, pages 2001–2023 on November 9, 2006; and that the mortgage was given to secure a $1.2 million promissory note payable to American Home Mortgage. J.E. 34. In other words, at the time he signed the satisfaction of mortgage, Mr. Junk understood that it described the Mortgage that is Joint Exhibit 33, Tr. at 224–26, on which MERS is named as the nominee of American Home Mortgage.[8] Mr. Junk testified that he obtained the information provided in the satisfaction of mortgage from his mortgage file. Tr. at 224. Mr. Junk also signed and filed a "Lost Mortgage Satisfaction" stating that "[t]he undersigned, being the owner and holder of the above described mortgage, acknowledges that the debt which was secured thereby has been paid in full and the lien of the mortgage is satisfied and cancelled."[9] As he did with the satisfaction of mortgage, when he signed the lost mortgage satisfaction Mr. Junk identified himself as an agent of American Home Mortgage. J.E. 34; Tr. at 222. He did so even though he knew that he had not paid the full amount due under the Note and, as far as he knew, neither had Mrs. Junk. Tr. at 232–33. According to Mr. Junk, he believed that some entity had paid off the $1.2 million note but did not know the identity of that entity. Tr. at 234–35.

## C. The Lengthy History of the Litigation in South Carolina

On September 11, 2009, the Junks filed a complaint (J.E. 6) against American Home Mortgage, MERS and John Does 1 through 5,000 in the Beaufort County Court of Common Pleas. The Junks demanded a non-jury trial before the Beaufort County Master–in–Equity, asking him to quiet title in the Oldfield property solely and forever in their names. J.E. 6.

---

8. In their Objection to Dismissal or Conversion, which the Junks incorporated by reference into their objection to the Stay Relief Motion, the Junks stated that the satisfaction of mortgage filed by Mr. Junk "purports to satisfy the mortgage of American Home Mortgage ('AHM')—not the MERS as Original Mortgagee (MOM) security instrument that is recorded...." Junks' Objection to Mot. to Dismiss at 1 n.1. That statement is untrue. As discussed above, the contents of the satisfaction of mortgage clearly show that it was intended to release the Mortgage with MERS as nominee that was recorded in Beaufort County and was admitted as Joint Exhibit 33.

9. In light of Mr. Junk's filing the Lost Mortgage Satisfaction, it is somewhat perplexing that Mr. Brunner raised an issue during the hearing of the appropriateness of MERS using a form entitled "Lost Mortgage Certificate" when it filed the release of the 2005 mortgage. Tr. at 54–55; 99.

Each of the Junks signed a verification to the complaint stating that "I have read the foregoing Complaint and know the contents thereof" and that the "same is true of my own knowledge, except as to those matters which are therein stated on information and belief, and to those matters, I believe it to be true." J.E. 6; Tr. at 231. One of the statements the Junks verified to be true was that they were "ignorant of the true names and capacities of Defendants sued herein as JOHN DOES 1 through 5,000, inclusive, and therefore sue these Defendants by such fictitious names." J.E. 6 ¶ 19. The Junks also stated that they would "amend this complaint to allege their true names and capacities when and if ascertained." J.E. 6 ¶ 19. The Junks filed an amended complaint to quiet title, but again named only American Home Mortgage, MERS and John Does 1–5,000 as defendants. J.E. 7.[10]

MERS filed a motion to dismiss the quiet title action or, in the alternative, for summary judgment. In response, the Junks filed a brief (J.E. 9) stating, among other things, that they received a letter in July 2009 from Bayview advising the Junks that Bayview "had 'acquired the servicing' of [the Junks'] loan" and that on July 6, 2009 Bayview sent the Junks a letter stating that it was "seeking to bring the mortgage account current claiming it is the servicer on behalf of CitiMortgage as owner of the loan." J.E. 9 at 8. The July 6, 2009 date was more than two months before the Junks commenced their quiet title action in which they named only American Home Mortgage, MERS and John Does 1–5,000 as defendants. The Junks' brief also stated that, sometime before they filed the brief, they had "received a copy of their loan file directly from 'American Home Mortgage'" and that "[a]ccording to 'American Home Mortgage' it sold the loan to CitiMortgage on December 22, 2006—before the first payment was even due—and that the investor in the loan was now 'Citi Master Servicing.'"[11] J.E. 9 at 11.

On October 19, 2009, a document stating that MERS was assigning the Mortgage "[t]ogether with the note or notes therein described" to Bayview was recorded in Beaufort County. J.E. 35. On October 26, 2009, Bayview, alleging that it was the owner and holder of the Note and the Mortgage, filed a foreclosure complaint against the Junks. J.E. 8. Attached to the foreclosure complaint was a copy of the Note on which appears an indorsement stating "Pay to the Order of Citimortgage, Inc. Without Recourse By: American Home Mortgage Danielle Sterling, Asst. Secretary." J.E. 8.[12]

10. During the hearing on the Stay Relief Motion and the Dismissal/Abstention Motion, Mr. Junk testified under oath that he caused the quiet title action to be filed based on the knowledge that he had at that time. Tr. at 166. As explained below, this testimony is inconsistent with the conclusions reached by the Master–in–Equity in an order he entered on April 11, 2011.

11. The Junks also noted entries in a loan history they received from Bayview; the entries referenced an "Investor Loan Sale" and an "Inv. Loan Purchase." J.E. 9 at 8. Mr. Junk identified "Citi Master" as the investor. Tr. at 204.

12. Mr. Junk testified that, in addition to the copy of the Note with the indorsement to CitiMortgage, he has seen a copy of the Note with a blank indorsement. Tr. at 158. A copy of the Note with the blank indorsement is attached to proofs of claim 6–1 and 6–2 filed by CitiMortgage. *See* J.E. 32. A copy of the Note with an indorsement to CitiMortgage is included as part of CitiMortgage's amended proof of claim 6–3. Both indorsements are undated and appear to have been signed by Danielle Sterling on behalf of American Home Mortgage. Mr. Junk testified that he believed that Ms. Sterling was liable on the $1.2 million Note based on her signing of the indorsements. In this regard, Mr. Junk stated

The foreclosure complaint sought a determination of the amount due on the Note, a declaration that the Mortgage was the first mortgage lien on the Oldfield property and a judgment of foreclosure for the amount found to be due and owing, which Bayview alleged to be $1,199,628.22 plus interest, taxes, insurance and costs. J.E. 8.

In addition, Bayview sought punitive damages against Mr. Junk for filing the satisfaction of the Mortgage. It also requested reformation of the Mortgage to include in its legal description text that would cover .19 acres of the Junks' real property that was not included in the legal description. The foreclosure complaint suggests that the legal description alone is incomplete; there is no suggestion in the foreclosure complaint that the other information contained in the Mortgage identifying the encumbered property—the Parcel ID Number of R603 008 000 0061 000 or the address of 181 Oldfield Way, Okatie, South Carolina 29909—failed to completely describe the entirety of the property owned by the Junks. Furthermore, on October 27, 2009, Bayview filed a notice of lis pendens regarding the foreclosure action that included the complete legal de-

scription as well as a parcel number and street address. Ex. 37 to J.E. 46.

On March 19, 2010, a document stating that the Mortgage "[t]ogether with the note or notes therein described" was being assigned by Bayview to CitiMortgage was recorded in Beaufort County. J.E. 36. Bayview filed a motion to substitute CitiMortgage as plaintiff in the foreclosure action. Ex. 40 to J.E. 46. The Junks opposed the substitution of CitiMortgage as plaintiff in the foreclosure action, J.E. 10 at 88 and J.E. 11 at 34, and filed two motions to dismiss the action. J.E. 12 at 2. In their answer, the Junks included as a defense to the foreclosure action CitiMortgage's and Bayview's failure to make an appearance in the quiet title action. J.E. 15 at 18.

In December 2010, the Master–in–Equity held the first hearing in the quiet title action and the foreclosure action. J.E. 10. Attorney Brian Crotty appeared for MERS in the quiet title action and for Bayview in the foreclosure action. Attorney Parker Barnes appeared for the Junks. Also present was Mr. Junk, who, according to Mr. Barnes, was "helping me as a fine paralegal[.]" J.E. 10 at 70. The

that he was relying on paragraph 9 of the Note for the position that sureties and indorsers are liable on the Note. Tr. at 232–33. Although it would seem to be American Home Mortgage, not Ms. Sterling, who was the indorser—after all, the indorsements state that they were made "By: American Home Mortgage"—Mr. Junk contends that he "alleged [that] the indorser was liable" for the amounts owing under the Note and that "[s]he settled with me." Tr. at 233:1–3. Ms. Sterling provided an affidavit dated January 11, 2012 in which she stated that she had been made a third-party defendant in the litigation in South Carolina "due to the fact my alleged signature appears on the Notes and documents attached hereto and as described in an Affidavit of Jennifer Oakes attached hereto." Ex. 42 to J.E. 46 ¶ 13. She also conceded that she "did have the authority to

endorse documents for American Home Mortgage as I was instructed to endorse the last page of a Note using my stamp and signature from time to time." Ex. 42 to J.E. 46 ¶ 19. Because she conceded that she had such authority, the Junks were simply not telling the truth when they stated that "Ms. Sterling is of record swearing that she did not have authority to endorse the Note...." Objection to Dismissal or Conversion at 5 n.7. Ms. Sterling did deny that the signatures on the copies of the Note that she has seen were made by her. Ex. 42 to J.E. 46 ¶ 17. She states that she held the position in which she was authorized to indorse notes until sometime in the year 2007, Ex. 42 to J.E. 46 ¶ 11, which means that, if the signatures on the indorsements are hers, the affidavit she signed in 2012 was provided around five to six years after the signatures were placed on the indorsements.

Master–in–Equity noted that, before going on the record, he had asked counsel for the parties to discuss the potential conflict raised by the fact that he and the Junks had children who were classmates. He elicited the parties' thoughts on the issue, and counsel for the Junks and counsel for MERS and Bayview stated that they had no objection to the Master–in–Equity hearing the matters. J.E. 10 at 4. Counsel then addressed the parties' positions on the motion to dismiss or for summary judgment filed by MERS and the brief filed by the Junks. At one point, Mr. Junk attempted to correct his own attorney on a factual matter, and Mr. Crotty objected, arguing that he should have an opportunity for cross-examination if Mr. Junk was going to testify. J.E. 10 at 79. The hearing ended late in the afternoon, with the Master–in–Equity noting that they easily could have gone until midnight. J.E. 10 at 120. The Master–in–Equity said that he would hold a conference the next day for the purpose of scheduling another hearing as soon as possible. J.E. 10 at 120–21.

The Master–in–Equity convened the next hearing on a morning in February 2011. He noted that he had scheduled substantial time to hear the pending matters. J.E. 11 at 22. Mr. Crotty appeared for MERS, Bayview and, to the extent it would be substituted, CitiMortgage. Mr. Barnes also appeared, this time for Mrs. Junk only. Mr. Junk represented himself pro se.[13] Because Mr. Junk was representing himself pro se, he was permitted to speak, J.E. 11 at 13, and he did so at some length. The parties addressed the merits of the pending motions. In the quiet title action, those motions included a motion to dismiss by MERS, a motion for judgment on the pleadings and default judgment by the Junks and a motion by the Junks to require MERS to post a bond; in the foreclosure action the motions included motions to dismiss by the Junks and Bayview's motion to substitute CitiMortgage as plaintiff. Mr. Barnes stated that an attorney from Nelson Mullins had provided "discovery, kind of on a voluntary basis. . . ." J.E. 11 at 11.

The Master–in–Equity permitted Mr. Junk to provide "some context." J.E. 11 at 23:24. Among other things, Mr. Junk stated that he put approximately $300,000 down on the Oldfield property in 2005, J.E. 11 at 24, 27, that "I've never got my note back" from the original 2005 transaction that was refinanced in 2006 and that "[i]f somebody showed up with . . . the note from Mr. Junk, this affidavit [from MERS stating that the 2005 mortgage had been satisfied] wouldn't stand up at all[,]" J.E. 11 at 26:17–19, and "[s]o I don't know if they paid off" the owner of the 2005 note. J.E. 11 at 27–28.[14] Mr. Crotty argued that "[n]o one has tried to collect [on the 2005 note] . . . in four years. . . ." J.E. 11 at 29:6–8. The Master–in–Equity stated: "No one has attempted to collect or sent a collection letter or I haven't heard anything about anyone on these old notes attempting to collect on them, so I'm guessing that hasn't occurred." J.E. 11 at 30–31. He added: "[A]s far as the Beaufort County records are concerned, [the

---

**13.** During the hearing on the Stay Relief Motion and the Dismissal/Abstention Motion, Mr. Junk testified that the change was made "for financial reasons" because "Mr. Barnes' bill was going to be more than I could afford after we had the first hearing." Tr. at 199.

**14.** The Court is recounting statements made during state court hearings and in documents entered in the state court record only to demonstrate that the statements were made, not as a finding that such statements are true. Nothing in this order should be construed as a finding of fact or conclusion of law on matters to be heard and decided by the state courts of South Carolina.

2005 mortgage] is satisfied.... I mean, absent some finding to the contrary.... I've got to consider that mortgage ... to be satisfied, just as it says." J.E. 11 at 32:2–9. Mr. Junk contended that Bayview and CitiMortgage were properly served in the quiet title action by serving MERS; he also argued that it was appropriate to enter a default judgment against them. J.E. 11 at 16–17, 45–46. The Master–in–Equity stated that, while he was not ruling on whether CitiMortgage could "ultimately prevail on a foreclosure action[,]" that it was the true party in interest. J.E. 11 at 111. The February 2011 hearing lasted over three hours. J.E. 11 at 1, 129.

On April 11, 2011, the Master–in–Equity issued an order ruling on the matters then pending before him. J.E. 12. The order referenced the December 2010 and February 2011 hearings, noted that the parties had consented to his hearing the pending motions and stated that he had "carefully considered the[ ] motions, the supporting memoranda, affidavits, and other materials submitted by the parties and their counsel, the existing record in these matters, and the arguments offered by counsel for the parties." J.E. 12 at 2. The order provided background regarding the Note and the Mortgage, including language in the documents permitting their transfer and language in the Mortgage regarding the role of MERS. J.E. 12 at 3–4. As further background the order stated that "[d]espite being aware of the sale of the loan to CitiMortgage and the transfer of servicing rights to CitiMortgage and then to Bayview, the Junks excluded as named defendants these entities whom the Junks knew had an interest in this action and with whom the Junks had directly corresponded." J.E. 12 at 7. "Instead, the Junks

included 'John Doe' defendants who were served by publication." J.E. 12 at 7.

The Master–in–Equity also ruled on the pending motions, including a motion by the Junks to require MERS to post a bond. The Junks' motion to require MERS to post a bond was denied on the grounds that it was without any basis or support in that "[t]he 2005 Mortgage has been satisfied of record, and there is no reason to justify this Court requiring MERS to post any bond." J.E. 12 at 8. He denied the Junks' motion for judgment on the pleadings and for default judgment in the quiet title action on the basis that "Bayview and CitiMortgage were not proper 'John Doe' defendants in the Quiet Title Action, and the Junks' service by publication as to the John Doe defendants was of no effect as to either Bayview or CitiMortgage." J.E. 12 at 9. The Master–in–Equity denied the Junks' motions to dismiss the foreclosure action. J.E. 12 at 10. He also granted Bayview's motion to substitute CitiMortgage as plaintiff based on the assignment of the Mortgage from Bayview to Citi-Mortgage and CitiMortgage's possession of the original Note bearing an indorsement to CitiMortgage. J.E. 12 at 13. In addition, he dismissed the Junks' quiet title action without prejudice, stating that the "Junks' Quiet Title Action raises numerous issues challenging the validity and effect of the Mortgage that is the subject of the Foreclosure Action[,]" that "[i]n the interests of justice and judicial economy, these actions should be consolidated in some manner" and that "[t]herefore, this Court hereby grants MERS' motion to dismiss the Quiet Title Action without prejudice, and directs the Junks to assert whatever claims or issues they contend apply in their Answer to the Foreclosure Actions's complaint." [15] J.E. 12 at 10.

**15.** The Junks filed a notice of appeal of the Master–in–Equity's April 11, 2011 order. J.E.

13. On September 13, 2011, the South Carolina Court of Appeals dismissed the Junks'

On June 16, 2011, the Junks filed a document entitled "Defendants Daniel L. Junk's and Christine H. Junk's First Amended Answer, Counterclaims and Third–Party Complaint." J.E. 15. The document is 152 pages long, with pages 1 to 27 consisting of an answer and defenses to the foreclosure complaint, pages 27 to 90 styled as defenses and counterclaims and pages 90 through 152 asserting a third-party complaint against numerous defendants. Mr. Junk was involved in the drafting of this document, and he and Mr. Barnes both signed it, as was the case with some of the other documents filed with the state courts. Tr. at 241, 249–52. In their prayer for relief, the Junks requested dismissal of the foreclosure action with prejudice, a judgment quieting title of the Oldfield property solely in their names and actual and punitive damages. J.E. 15 at 152. The basis for the asserted damages was, among other things, civil conspiracy and slander of title. J.E. 15 at 100, 130. The Junks demanded a jury trial. J.E. 15.

In August 2011, the Junks moved to Columbus, Ohio, where Mr. Junk took a new job in the e-discovery field.[16] Tr. at 153. Despite having moved to Columbus, Mr. Junk continued to represent himself and appear personally before the Master–in–Equity in South Carolina. J.E. 17, J.E. 18, J.E. 20. Mrs. Junk continued to be represented by Mr. Barnes.[17]

In September 2011, the Master–in–Equity held another hearing in the foreclosure action. Mr. Barnes appeared for Mrs. Junk, Mr. Junk appeared for himself, Mr. Crotty appeared for his clients and other attorneys appeared for some of the third-party defendants sued by the Junks. Most of the hearing was devoted to addressing a motion to dismiss filed by the Riley Pope Defendants on the grounds of failure to state a claim and improper use of third-party practice. Mr. Junk argued to the Master–in–Equity that, in naming the Riley Pope Defendants as third-party defendants "we were following your order of bring all our claims, counterclaims, third-party complaint in our answer to the foreclosure action[,]" and Mr. Barnes stated "[t]hat's what your previous order had indicated." J.E. 17 at 35:18–23. The Master–in–Equity responded that "I assume I meant pursuant to the rules of civil procedure." J.E. 17 at 36:1–2.

Next was a hearing in January 2012. Mr. Junk, Mr. Barnes, Mr. Crotty and other counsel were present. They first discussed the reasons a foreclosure intervention and an attempt at a global settlement had not resulted in a resolution of the case during the several months between hearings. J.E. 18 at 8–12. Mr. Junk and counsel for the parties then addressed the issue of whether the Riley

---

appeal on the basis that the order was not immediately appealable. J.E. 16. The Junks appealed that ruling to the South Carolina Supreme Court, but, on February 7, 2013, the South Carolina Supreme Court denied certiorari. J.E. 26. On or about February 20, 2013, the Junks filed yet another notice of appeal of the April 11, 2011 order. J.E. 27. On July 2, 2013, the South Carolina Court of Appeals again dismissed the appeal, finding that "the February 20, 2013 Notice of Appeal seeks review of the same order this court [previously] found unappealable" and that "no subsequent event has occurred that would render the order in question, which was issued by

the master-in-equity on April 11, 2011, appealable." J.E. 30.

16. Mr. Junk lost the job that he moved to Columbus to take, and later obtained, but lost, yet another job after his employer "closed their New York office, their L.A. office." Tr. at 155.

17. In fact, the Junks participated in the litigation in South Carolina while living in Columbus for nearly two years before commencing their bankruptcy case on June 27, 2013 ("Petition Date"). Tr. at 154.

Pope Defendants and the numerous other parties who had been named by the Junks as third-party defendants—and whom the Junks then attempted to name as counterclaim defendants—were properly joined as defendants under the South Carolina Rules of Civil Procedure.[18] Mr. Junk on behalf of himself and Mr. Barnes on behalf of Mrs. Junk asserted that the defendants were necessary parties to the claim for civil conspiracy against CitiMortgage because all the defendants conspired together to bring an unlawful foreclosure action against the Junks. Attorneys for CitiMortgage and certain third-party defendants argued that, because the Junks were not contending that the third-party defendants were liable on the Note along with the Junks, but instead were alleging that the third-party defendants were liable to the Junks on separate, independent claims, they were not proper parties to the claims between the Junks and CitiMortgage. J.E. 18 at 12–62. During the argument, the Master–in–Equity stated that "you owe the money to someone[,]" J.E. 18 at 37, and Mr. Junk stated "Yes, just not them." J.E. 18 at 37.

The Master–in–Equity then heard motions by third-party defendants to set aside entries of default obtained against them by the Junks, J.E. 18 at 62–94, including a motion by Colonial Coast, whose counsel stated that another attorney for Colonial Coast had missed the deadline to respond to the Junks' third-party complaint in part due to the serious medical condition of a close family member, which required him to undergo regular treatments. Mr. Junk argued that an attorney's negligence can be imputed to the client, that Colonial Coast had not shown any cause to set aside the entry of default and that he and Mrs. Junk would be prejudiced because they had complied with the procedural rules for obtaining a default. After the Master–in–Equity stated that he would grant Colonial Coast's motion to set aside the entry of default, Mr. Junk requested that the Master–in–Equity certify the ruling granting Colonial Coast's motion to set aside the default as a final order for immediate appeal. The Master–in–Equity took that request and the other matters he had heard under advisement. J.E. 18 at 87–94. Because the hour was getting late, everyone agreed to hear CitiMortgage's motion to dismiss counterclaims at a later date. The parties all agreed to February 23, 2012 as the date of the next hearing. J.E. 18 at 100.

On February 22, 2012, the Master–in–Equity entered an order on the matters he had heard during the September 2011 and January 2012 hearings. J.E. 19. He held that the "Junks' Third–Party Complaint [was] an improper attempt to assert claims against the Third–Party Defendants that are not derivative of the Junks' liability to CitiMortgage[,]" J.E. 19 at 5, because "[t]he Junks do not allege, and cannot plausibly allege, that any of the Third–Party Defendants are liable to pay the Junks' mortgage debt." J.E. 19 at 6. He also denied the Junks' motion to join the third-party defendants as counterclaim defendants, concluding that the third-party defendants were not necessary parties to the foreclosure action, because "the Third–Party Defendants do not need to be joined as parties in order for CitiMortgage to

---

**18.** In addition to the Riley Pope Defendants, those defendants included Bayview; MERS; MERSCORP, Inc.; Citi Master Servicing; Citigroup Global Markets Realty Corp.; Citigroup Mortgage Loan Trust, Inc.; Jennifer Oakes; Robert Hall; Security Connections, Inc.; Krystal Hall; Danielle Sterling; ABC Appraisal Group, Inc.; Mark Ruplinger; Linda Heller; Harry Jones; Colonial Coast; Lawyers Title, Corelogic, Inc.; and American Home Mortgage Holdings, Inc.

obtain complete relief in the foreclosure action, nor are they required for the Junks to obtain complete relief under any of their defenses or counterclaims against Citi-Mortgage." J.E. 19 at 7. He also stated that adding the third-party defendants "would serve only to complicate and further delay the foreclosure action that has already been significantly delayed." J.E. 19 at 9.

The Master–in–Equity further ruled that the Junks' third-party claims failed as a matter of law for several reasons. First, he concluded that substantively the Junks' conspiracy claim was a claim for malicious prosecution of the foreclosure action and that the Junks had failed to allege—and could not yet allege—one of the required elements of a malicious prosecution claim: termination of the foreclosure action in their favor. He therefore dismissed the Junks' civil conspiracy claim and held that it could not be reasserted by making the third-party defendants counterclaim defendants, J.E. 19 at 10–11, noting that, if the third-party defendants "have information that may be relevant to the claims and defenses of the foreclosure action, then that information may be sought by the Junks through normal Third–Party discovery available under South Carolina Rules of Civil Procedure." J.E. 19 at 11 n.6.

The Master–in–Equity also dismissed the Junks' claim for slander of title on the basis that "[t]he documents on which the Junks base their third-party claim for slander of title are absolutely privileged and will not support the claim" and held that the claim could not be reasserted by making the third-party defendants counterclaim defendants. J.E. 19 at 12–13. He held that the Junks' claim for profes-sional negligence against the Riley Pope Defendants lacked merit as a matter of law because no attorney-client relationship existed between those parties and the Junks and because those parties owed no duty to the Junks. J.E. 19 at 13–14. He also granted the pending motions for relief from entry of default on the ground of lack of any significant prejudice to the Junks and held that Mr. Junk's request to certify the ruling granting Colonial Coast's motion for immediate appeal was moot in light of the dismissal of the third-party complaint. J.E. 19 at 14–16. Finally, the Master–in–Equity concluded that, because the "third-party claims are independent claims arising out of a separate transaction or occurrence" than the Note and the Mortgage that were the subject of the foreclosure action, the hearing scheduled for February 23, 2012 would proceed notwithstanding any possible appeal of the order. J.E. 19 at 16.[19]

On February 23, 2012, the Master–in–Equity held the hearing on the motions still pending from the January hearing. J.E. 20. Mr. Junk began by arguing that, despite the dismissal of the third-party complaint in which American Home Mortgage Holdings, Inc. was named as a defendant, the Junks' pending motion for default judgment against American Home Mortgage Holdings, Inc. should be granted. J.E. 20 at 4–11. The Master–in–Equity concluded that the dismissal of the third-party complaint mooted the default and stated that he would enter an order to that effect. J.E. 20 at 11.[20]

That left CitiMortgage's motion to dismiss the counterclaims asserted against it by the Junks pursuant to Rule 12(b)(6) of the South Carolina Rules of Civil Proce-

---

**19.** The Junks appealed the February 22, 2012 order. J.E. 21. That appeal remains pending. J.E. 4.

**20.** He entered that order on May 3, 2012. The Junks appealed the order. J.E. 24. The appeal remains pending.

dure.  Mr. Junk, Mr. Barnes on behalf of Mrs. Junk and Mr. Crotty for CitiMortgage addressed that matter, with the Master–in–Equity directing them to move through the document the Junks filed in June 2011 and take each counterclaim in turn.  They discussed the counterclaims, including whether they were barred by a three-year statute of limitations that arguably began to run in November 2006.  Mr. Junk argued to the Master–in–Equity that the statute of limitations did not begin to run in November 2006 because, among other things, he "didn't know what securitization was" at the time he refinanced. J.E. 20 at 74:9–10.  This statement, which Mr. Junk made while he was representing himself pro se, contradicts Mr. Junk's sworn testimony before this Court.  Here, Mr. Junk testified that he worked at Simpson Thacher from the years 1993 until 2000, Tr. at 219, and that "[t]he owner of the software firm that installed the knowledge management . . . system at Simpson

Thacher, then hired me as his director of sales in 2000 to sell an e-discovery product which was brand new."  Tr. at 152.  Mr. Junk also testified in this Court that his belief that the Note has been paid off was not based on his consultation of the source being suggested by the attorney for Citi-Mortgage (a particular blog), but instead was based on "[m]y knowledge of the process of securitization and forward sales" and that the knowledge was "obtained through the securitizations that Simpson Thacher did at the time I was there" and that he had "personal knowledge and experience from time at Simpson Thacher & Bartlett and understanding the process of securitization."  Tr. at 235–36.  If Mr. Junk's testimony is to be believed, he knew about securitization by the time he left Simpson Thacher in 2000.  Yet Mr. Junk told the Master–in–Equity that he did not know what securitization was at the time he refinanced in 2006.[21]

21.  Although perhaps the most blatant example, this is only one of several inconsistencies in Mr. Junk's testimony and in the positions taken by the Junks before the South Carolina courts and this Court.  While representing himself before the Master–in–Equity, Mr. Junk argued that the note he and his wife issued in 2005 to American Home Mortgage had not been paid off.  J.E. 11 at 26–28.  Mr. Brunner likewise argued on behalf of the Junks that the 2005 note was not paid off in connection with the refinancing transaction and that the possibility exists that some entity will attempt to enforce the note against them. Tr. at 272.  Mr. Junk and Mr. Brunner make this argument despite contending that the 2005 note was securitized.  Tr. at 274.  As discussed above, Mr. Junk testified that he is relying on the securitization of the Note and his knowledge of securitization as the grounds for believing that the Note was paid off by some unidentified third party.  At the same time, though, he is arguing that the note they issued to American Home Mortgage in 2005 was securitized but not paid off.  And when the Court inquired about the statute of limitations for suing on the 2005 note, Mr. Brunner stated that the statute of limitations "runs

from the time of the breach" and questioned whether "there in fact [was] a breach and when did the breach occur?"  Tr. at 272–73. Regardless of when the statute of limitations begins to run, the suggestion that there has been no breach makes no sense.  The Junks would have stopped paying on the 2005 note after the refinancing in 2006.  Thus, if, as they contend, the note they issued in 2005 has not been paid off, then there certainly has been a breach.  In fact, if the 2005 note was not paid off in 2006, then at this point approximately eight years have elapsed without payments being made on the 2005 note and without any entity bringing an action on it. When the Court asked during the hearing whether someone would have come forward to enforce the 2005 note during those eights years, Mr. Brunner's response was "if it is in a securitization they may well not have[,]" Tr. at 274, which leads directly back to the inconsistent points that Mr. Junk is arguing: i.e., that the Note the Junks issued in 2006 was paid off as a result of the securitization process, but the 2005 note was not. The Junks have not explained these contradictory positions.  And all of this is in addition to the misstatement discussed above—in a brief filed

At one point during the February 23, 2012 hearing, Mr. Barnes stated to the Master–in–Equity that "we have yet to survive a 12(b)(6) motion in this case and I can't—I don't think I pled it that badly, to be honest with you." J.E. 20 at 94:11–13. Mr. Junk argued that it would be inappropriate to dismiss his counterclaims against CitiMortgage because there were issues of fact that required discovery and a jury trial. J.E. 20 at 94.

On April 24, 2012, the Master–in–Equity entered an order dismissing the counterclaims asserted by the Junks against CitiMortgage for fraud, negligent misrepresentation, breach of contract, civil conspiracy, slander of title and rescission under the Truth in Lending Act ("TILA")— each of the counterclaims asserted by the Junks against CitiMortgage—with prejudice. J.E. 22. The fraud, negligent misrepresentation, breach of contract, civil conspiracy and TILA claims were dismissed on the basis that they were barred by the applicable statute of limitations. J.E. 22 at 3–8, 11. The claim for rescission of the Note and the Mortgage under TILA was dismissed for two additional reasons: (1) that the Junks had failed to state a claim for relief because they had "failed to plead or otherwise allege in the counterclaims that they possessed the ability to tender the loan proceeds as required to maintain a TILA rescission counterclaim" but instead were "seek[ing] to avoid their mortgage obligation altogether while keeping the house[;]" and (2) the Junks did not exercise the right, if any, to rescind in a timely fashion. J.E. 22 at 10–11. The Master–in–Equity dismissed the slander of title claim because "the Junks base this claim on a belief that the filing of this foreclosure action, the lis pendens, and other related judicial proceedings in that action damaged [their] title" but that "[s]uch claims cannot support a slander of title action." J.E. 22 at 12. Finally, he concluded that two of the causes of action included among the Junks' counterclaims—counterclaims 18 and 20—were actually defenses to the foreclosure action. J.E. 22 at 12.[22]

To date, the Master–in–Equity has ruled on the counterclaims and the third-party complaint, disposing of claims set forth in approximately 120 pages of the document the Junks filed in June 2011. All that is left for the Master–in–Equity to decide are the pending claims of CitiMortgage and the Junks' defenses.

Among others, the defenses asserted by the Junks in the foreclosure action include that the Mortgage is not a valid mortgage under South Carolina law and that its terms are a nullity because MERS was named as mortgagee as nominee for American Home Mortgage, an entity the Junks claim has never been a member of MERS, J.E. 15 ¶¶ 8–9, 13, 137; that MERS (the entity that assigned the Note to Bayview) never had an interest in the Note to assign; J.E. 15 ¶ 9; that the assignments of the Mortgage were fraudulent and resulted in no transfer of an interest in the Oldfield property, J.E. 15 ¶¶ 12, 17; that

on the Junks' behalf—that Ms. Sterling had conceded that she did not have the authority to indorse documents for American Home Mortgage, when in fact she stated precisely the opposite—that she did have that authority.

**22.** The Junks appealed the Master–in–Equity's April 24, 2012 order. J.E. 23. That appeal remains pending. J.E. 4. On December 21, 2012, Mr. Junk and Mr. Barnes submitted a 41–page initial brief in connection with the appeal of the February 22, 2012 order, the April 24, 2012 order and the May 3, 2012 order. J.E. 25. Mr. Junk was the first and final drafter of the initial brief and the primary drafter of a reply brief (J.E. 29). He drafted the documents while he was living in Columbus, Ohio. Tr. at 248–49; 252.

the Note is unenforceable because it was separated from the Mortgage, J.E. 15 ¶¶ 17(i), 137(f) and (i); that the Note "was paid in full by a third-party guarantor or surety without recourse" and that the payment was accepted "with the intention that it operated as a satisfaction of the Junks' obligation[,]" J.E. 15 ¶ 21; that the signatures on the Note are not authentic and that the indorsements on the Note were made without authority, J.E. 15 ¶¶ 7, 27; that CitiMortgage therefore is not a holder in due course of the Note under South Carolina law, J.E. 15 ¶¶ 28, 32, 37, 41, 45, 51, 117, 136; that CitiMortgage's claims are barred by the Junks' notice of rescission and the lack of a response to the notice, J.E. 15 ¶¶ 46–47; and that Bayview and CitiMortgage did not assert counterclaims in the quiet title action, J.E. 15 ¶ 48.[23]

### D.  The Adversary Proceeding

Each of those defenses is mirrored by a position the Junks take in this adversary proceeding.[24]  In state court the Junks argued that the Mortgage is not a valid mortgage under South Carolina law and that its terms are a nullity given that MERS was named on the Mortgage as mortgagee solely as nominee for American Home Mortgage; the Junks make the same allegations regarding the Mortgage, MERS and American Home Mortgage in the Complaint, J.E. 46 ¶¶ 155–170, and based on those allegations seek a determination that CitiMortgage's asserted mortgage interest in the Oldfield property is void and unenforceable.  J.E. 46 ¶¶ 389, 392.  As they did in the foreclosure action, the Junks assert that MERS had no interest in the Note and the Mortgage and therefore no interest that it could assign. J.E. 46 ¶¶ 161, 240, 266–67.

The Junks also take the position in the adversary proceeding that the Mortgage is void because the proceeds of the November 2006 loan were not used to pay off the 2005 loan from American Home Mortgage, J.E. 46 ¶¶ 192, 313, 316–35, a position the Junks relied on before the Master–in–Equity.  J.E. 11 at 27–28; J.E. 15 ¶ 153(t). In the state court, the Junks alleged that problems with various assignments of the Mortgage make it unenforceable;  they reassert the same argument here.  J.E. 46 ¶¶ 261–292, 342–43.  They argued in state court that the Note was separated from the Mortgage.  So too here.  Tr. at 173. The Junks alleged in state court that the Note has been paid in full by an unidentified third party, and Mr. Junk testified to the same effect here.  Tr. at 234–36.  In state court, the Junks took the position that CitiMortgage is not a holder or holder in due course of the Note under South Carolina law;  they make that argument to

**23.** The last ruling by a court in South Carolina before the Petition Date was the February 7, 2013 order of the South Carolina Supreme Court denying certiorari on the South Carolina Court of Appeals' dismissal of the appeal of the Master–in–Equity's April 11, 2011 order.  J.E. 26.  After the Petition Date, the South Carolina Court of Appeals dismissed the Junks' second attempt to appeal the April 11, 2011 order, stating that it "seeks review of the same order this court found unappealable" once before.  J.E. 30.  The Junks filed a suggestion of stay, and, on August 9, 2013, the South Carolina Court of Appeals issued an order stating that "[w]e hold this appeal [of the February 22, 2012 and April 24, 2013 orders] in abeyance pending notification that (1) the United States Bankruptcy Court has authorized either [the Junks] or their bankruptcy trustee to proceed with this appeal or (2) Appellants' bankruptcy action has been resolved."  J.E. 31.

**24.** Not counting exhibits, the Complaint is 77 pages long.  When asked if he was the primary drafter of the Complaint, Mr. Junk claimed that he did not understand the question, but did admit that he contributed to the drafting of the Complaint.  Tr. at 213.

this Court as well. J.E. 46 at 2 n.1 and ¶ 380. Likewise, the allegations the Junks made in state court regarding inauthentic signatures and unauthorized indorsements also appear in the Complaint, J.E. 46 ¶¶ 197, 299–301, 339, as do their contentions that CitiMortgage's claims are barred by the notice of rescission the Junks sent under TILA, J.E. 46 ¶¶ 206–15, and by CitiMortgage's and Bayview's failure to make appearances in the quiet title action. J.E. 46 ¶¶ 246–256, 276.

In Count One of the Complaint, the Junks seek a declaratory judgment that the Mortgage is unenforceable. In Count Eight they seek a declaratory judgment as to the ownership of and interests in the Oldfield property, and in Counts Nine and Ten they request cancellation of both the Note and CitiMortgage's asserted interests in the Oldfield property. In Count Eight the Junks seek disgorgement based on alleged unjust enrichment received from certain of the defendants, and in Count Nine they seek an accounting from those defendants in order to assess the extent of the alleged unjust enrichment.

The relief requested by the Junks under the Bankruptcy Code is predicated on the purported unenforceability of the Note and the Mortgage. They seek avoidance of, and a declaratory judgment with respect to, the Mortgage under 11 U.S.C. § 544 and South Carolina law in Counts One, Two, Three and Six; preservation of the mortgage lien under § 551 in Count Four; recovery of property under § 550 in Count Five; a determination that CitiMortgage has no secured claim under § 506 in Count Seven; and a determination that CitiMortgage has no claim at all in Count Twelve.[25] Finally, they assert a claim under federal nonbankruptcy law—Count Eleven's claim under the Federal Fair Debt Collection Practices Act.

## V.  Legal Analysis

### A.  Overview

In light of the foregoing factual and procedural background, and having considered the factors that are relevant to a request for relief from the automatic stay in order to continue litigation in a nonbankruptcy forum, the Court grants CitiMortgage relief from stay to continue the state court litigation as to the Oldfield property. Likewise, based on its consideration of the relevant permissive abstention factors, the Court abstains from the counts of the adversary proceeding in which the Junks seek a determination that the Note and the Mortgage are unenforceable and that they own the Oldfield property free of CitiMortgage's asserted interest. As debtors in possession, the Junks have the powers of a Chapter 11 trustee and are authorized to litigate the foreclosure action in state court, including by pursuing their various appeals of the orders the Master–in–Equity has already entered or will enter in the future. Finally, the Court will hold the remainder of the adversary proceeding in abeyance and stay discovery pending the issuance of final, nonappealable orders by the South Carolina courts.

### B.  Relief from Stay

#### 1.  Scope of Request

CitiMortgage does not request relief from the automatic stay to pursue damages resulting from Mr. Junk's filing of documents purporting to satisfy the Mortgage. Rather, CitiMortgage seeks relief

---

**25.** On October 4, 2013, CitiMortgage filed a proof of claim in the amount of $1,563,691.98; on October 17, 2013 it filed an amended proof of claim for $1,492,623.06; and on January 21, 2014 it filed a further amended proof of claim (attaching additional supporting documents) in the amount of $1,495,088.84. J.E. 32.

from stay only "as to the property commonly known as 181 Oldfield Way, Okatie, SC 29909." Stay Relief Mot. at 1. Because the request is made as to the Oldfield property, it includes the count of the state court complaint by which CitiMortgage seeks a foreclosure judgment.

■ The request also includes the count in CitiMortgage's foreclosure complaint by which it seeks reformation of the Mortgage, a request for relief that warrants further discussion. As debtors in possession, each of the Junks has the rights and powers of a hypothetical judicial lien creditor and bona fide purchaser who gained that status as of the Petition Date. *See* 11 U.S.C. § 544(a). Reformation is permissible only if it is not inconsistent with those rights and powers under applicable state law. Because applicable state law is the law of the state where the property is located, *see Drown v. Wells Fargo Bank, N.A. (In re Scott)*, 424 B.R. 315, 329 (Bankr.S.D.Ohio 2010), *aff'd*, 2011 WL 1188434 (Mar. 29, 2011), the question is whether reformation would be effective under South Carolina law against an entity who became a judicial lien creditor of the Junks or a bona fide purchaser of real property from the Junks as of the Petition Date.

Federal courts are sometimes called upon to predict how a state court would rule on the question of whether a mortgage is valid with respect to bona fide purchasers and judicial lien creditors. For example, in a bankruptcy case where a Chapter 7 trustee was seeking to avoid a mortgage on residential real property and the mortgage identified the encumbered property with a correct street address and parcel number but no legal description, the Sixth Circuit noted that "[m]ortgaging part rather than all of a single-dwelling residential subdivision property is far enough outside the ordinary course of business that a reasonable prospective purchaser should assume that an ambiguous mortgage likely intended to encompass the entire residential lot at issue." *Argent Mortg. Co. v. Drown (In re Bunn)*, 578 F.3d 487, 489–90 (6th Cir.2009). For that reason, the Sixth Circuit predicted that "[t]he Ohio courts would likely hold that a purchaser would have knowledge that the mortgage encumbers the [entire] property, and that such a purchaser thus could not set aside the mortgage under Ohio's recording act." *Bunn*, 578 F.3d at 489.

The South Carolina courts might take the same approach to the Mortgage. The South Carolina Supreme Court has held in the analogous context of deed reformation that "[w]hen a court orders the reformation of a deed, the reformed deed necessarily speaks as of the date of its original execution" and that "[e]quity says that the reformed deed is to be considered as the true deed, *subject, of course, to the rights of subsequent creditors and purchasers for value, who may have been misled to their injury.*" *Lawrence v. Clark*, 115 S.C. 67, 104 S.E. 330, 334 (1920) (emphasis added). As to whether subsequent creditors and purchasers would have been misled, it bears noting that the foreclosure complaint seeks only to correct the Mortgage's legal description, suggesting that the Mortgage's other property identifiers—the Parcel ID Number of R603 008 000 0061 000 and the address of 181 Oldfield Way, Okatie, South Carolina 29909—completely describe the entire property. Further, a notice of lis pendens that included the complete legal description as well as the parcel number and street address was filed before the Petition Date. But unlike in *Bunn*, which involved no request for relief from the automatic stay to litigate the issue in a pending state court proceeding, here the Court need not predict how the holding of *Lawrence* should be applied

in the context of the Mortgage. Instead, the Court may leave to the South Carolina courts the decision whether the recording of the Mortgage and the notice of lis pendens would provide a basis to render reformation of the Mortgage effective as to judicial lien creditors and bona fide purchasers. For the reasons stated below, the Court concludes that it is appropriate to grant relief from stay so that the South Carolina courts can decide that issue as well as whether the Note and the Mortgage are enforceable by CitiMortgage.

## 2. Statutory Basis for Relief from Stay

■ CitiMortgage seeks relief from stay as to the Oldfield property under both § 362(d)(1) and § 362(d)(2) of the Bankruptcy Code. Relief from stay under § 362(d)(2) is available with respect to property only if "the debtor does not have an equity in such property" and "such property is not necessary to an effective reorganization[.]" 11 U.S.C. § 362(d)(2). The party requesting relief from stay has the burden of proof on the issue of equity. *See* 11 U.S.C. § 362(g)(1).

It appears that the Junks will lack equity in the Oldfield property only if the Mortgage is unenforceable. Because lack of equity is a predicate to granting relief from stay under § 362(d)(2), if the Court were to grant CitiMortgage relief from stay under that subsection, the Court effectively would be adjudicating the issue of the enforceability of the Note and the Mortgage, an issue that the remainder of the Court's analysis demonstrates should be determined by the South Carolina state courts. Therefore, CitiMortgage is not entitled to relief from stay under § 362(d)(2) at this time.

Relief from stay, however, is available for "cause" under § 362(d)(1) to permit state court litigation to go forward under certain circumstances. Section 362(d)(1) of the Bankruptcy Code states:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest[.]

11 U.S.C. § 362(d)(1).

## 3. CitiMortgage's Standing to Seek Stay Relief Under § 362(d)(1)

■ Based on their assertion that CitiMortgage is not entitled to enforce the Note and the Mortgage, the Junks argue that CitiMortgage lacks the standing necessary to seek relief from stay. *See* Opp'n to Stay Relief at 5–9. The Court disagrees. Section 362(d)(1) permits relief from stay to be requested by a "party in interest." 11 U.S.C. § 362(d)(1). A creditor of the debtor is a party in interest in a Chapter 11 case. *See* 11 U.S.C. § 1109(b). The term creditor includes an entity holding a prepetition "claim against the debtor[,]" 11 U.S.C. § 101(10)(A), and a " 'claim against the debtor' includes claim against property of the debtor[.]' " 11 U.S.C. § 102(2). CitiMortgage certainly asserts that it has a claim against property of the Junks.

In addition, the term claim means both "right to payment" and "right to an equitable remedy for breach of performance if such breach gives right to a right to payment," in both instances whether or not such right is disputed or undisputed. 11 U.S.C. § 101(5)(A) and (B). The "right to foreclose on the mortgage can be viewed as a 'right to an equitable remedy' for the debtor's default on the underlying obligation." *Johnson v. Home State Bank*, 501 U.S. 78, 84, 111 S.Ct. 2150, 115

L.Ed.2d 66 (1991). The Junks have objected to CitiMortgage's claim, including its right to foreclose. But because the term "claim" includes a right to payment or right to an equitable remedy whether or not such right is disputed, courts have held that a claim confers creditor status on the claimant despite the disputed nature of the claim. *See Johnston v. Jem Dev. Co. (In re Johnston)*, 149 B.R. 158, 161 (9th Cir. BAP 1992) ("[T]he purchasers are creditors pursuant to § 101(10)(A) because they are the holders of a right to payment. This right, although in dispute, is nevertheless a claim. Accordingly, the holder of this claim is a creditor of the debtor.").

Of course, it is not just any creditor who may seek relief from stay to continue litigation outside the bankruptcy court; the creditor must have an interest in the litigation. CitiMortgage does. It is the plaintiff in the state court litigation by virtue of an order the Master–in–Equity issued substituting it as plaintiff. And the Master–in–Equity gave as the reasons for substituting CitiMortgage the assignment of the Mortgage from Bayview to CitiMortgage and CitiMortgage's possession of the original Note bearing an indorsement to Citi-Mortgage. J.E. 12 at 13. This distinguishes one of the cases on which the Junks rely for their standing argument, *In re Wilhelm*, 407 B.R. 392 (Bankr.D.Idaho 2009), a case where there were no indorsements on the notes at all. *See Wilhelm*, 407 B.R. at 402. In addition to the indorsement, there are other indications of CitiMortgage's interest. In one of their own briefs filed in the state court the Junks noted that Bayview sent them a letter stating that it was seeking to bring the Mortgage account current on behalf of CitiMortgage as owner of the loan and that, sometime before they filed the brief, the Junks had received a copy of their loan file in which CitiMortgage was identified as the purchaser of the loan. Thus, this

case is not like another case on which the Junks rely, *In re Sheridan*, No. 08–20381, 2009 WL 631355 (Bankr.D.Idaho, Mar. 12, 2009), where MERS filed a motion for relief from stay despite admittedly having no pecuniary interest in the note. *See Sheridan*, 2009 WL 631355, at *4.

In order to have standing to seek relief from stay under § 362(d)(1) to continue the foreclosure action, CitiMortgage need only have a colorable, or plausible, interest in the Note and the Oldfield property. *See In re Rice*, 462 B.R. 651, 656–57 (6th Cir. BAP 2011). The Sixth Circuit has described a colorable claim as "one that rises 'above the speculative level,' one that is 'plausible on its face.'" *Gilles v. Garland*, 281 Fed.Appx. 501, 506 (6th Cir.2008). While the Court stops short of deciding that the Note and the Mortgage are enforceable by CitiMortgage, based on the documents evidencing an indorsement of the Note to CitiMortgage and an assignment of the Mortgage to CitiMortgage, the Court concludes that CitiMortgage has at least a colorable interest in the Note and the Mortgage as well as in the Oldfield property.

The Court accordingly concludes that CitiMortgage has standing to request relief from the stay for the purpose of seeking to continue the foreclosure action. The Junks' objection to CitiMortgage's standing boils down to nothing more than an argument that this Court, rather than the Master–in–Equity, should decide whether the Note and the Mortgage are enforceable and whether the Mortgage effectively encumbered the entire Oldfield property as of the Petition Date. For the reasons set forth below, whether CitiMortgage is entitled to enforce the Note and the Mortgage and whether reformation of the Mortgage would be effective against a judicial lien creditor and bona fide purchaser under South Carolina law should be

determined by the South Carolina state courts.

### 4. Factors Relevant to the Request for Relief from Stay

Cases in which courts have set forth the factors to be analyzed in determining whether cause for relief from the automatic stay exists under § 362(d)(1) to permit a creditor to pursue litigation pending outside the bankruptcy court include *Garzoni v. K–Mart Corp. (In re Garzoni)*, 35 Fed. Appx. 179 (6th Cir.2002); *McSwain v. Williams (In re Williams)*, No. 11–00536, 2012 WL 2974914 (Bankr.W.D.Tenn. July 20, 2012); and *Ewald v. Nat'l City Mortg. Co. (In re Ewald)*, 298 B.R. 76 (Bankr. E.D.Va.2002). Another bankruptcy court has aptly summarized the current state of Sixth Circuit law on this issue:

> The Sixth Circuit has not adopted a single, clear test to determine whether "cause" exists under 11 U.S.C. § 362(d)(1) in the context of a motion to modify the automatic stay to allow pending litigation in a nonbankruptcy forum to proceed to finality. It has, however, indicated that courts should consider a variety of factors, including judicial economy, trial readiness, the resolution of preliminary bankruptcy issues, the creditor's chance of success on the merits, the cost of defense or other potential burden to the bankruptcy estate, and the impact of the litigation on other creditors. *Garzoni v. K–Mart Corp. (In re Garzoni)*, 35 Fed.Appx. 179, 181 (6th Cir.2002).

*Williams*, 2012 WL 2974914, at *2.

In *Garzoni*, the Sixth Circuit stated that:

> Bankruptcy Code § 362(d)(1) provides that the bankruptcy court may grant relief from the automatic stay for cause. *See* 11 U.S.C. § 362(d)(1). The bankruptcy court considers the following factors in deciding whether to lift a stay: 1) judicial economy; 2) trial readiness; 3) the resolution of preliminary bankruptcy issues; 4) the creditor's chance of success on the merits; and 5) the cost of defense or other potential burden to the bankruptcy estate and the impact of the litigation on other creditors. *See In re United Imports, Inc.*, 203 B.R. 162, 167 (Bankr.D.Neb.1996).
>
> The bankruptcy court properly assessed these standards, giving weight to trial readiness in both state actions, the state law basis for the claims, the potential for inconsistent decisions on identical claims, and the duplication that would result if K–Mart pursued its claims against Garzoni in the bankruptcy court. Upon a review of the bankruptcy court's assessment, we are not left with a definite and firm conviction that it erred in its factual findings or legal conclusions.

*Garzoni*, 35 Fed.Appx. at 181.

■ Applying the factors set forth in *Garzoni*, the Court concludes that relief from stay should be granted to permit the appellate process to continue and to permit CitiMortgage to seek a judgment in the South Carolina courts on its claims for mortgage reformation and foreclosure.

### 5. Application of the Factors
#### a. Judicial Economy

Before the Junks commenced their bankruptcy case, the Master–in–Equity held five hearings and issued multiple orders in the foreclosure action over a period of time stretching from December 2010 through April 2012. The Master–in–Equity clearly has invested a significant amount of time and other judicial resources in the litigation, a factor that counsels in favor of granting relief from stay on the basis of promoting judicial efficiency.

*See In re Den Beste*, No. 12–4522, 2013 WL 1703391, at \*10 (N.D.Cal. Apr. 19, 2013) (affirming bankruptcy court's order granting relief from automatic stay and noting that, in granting relief from stay "[t]he bankruptcy court also considered judicial economy in finding that the state courts had invested significant time in adjudicating the issues"); *Jalali v. Pierce Assocs., Inc.*, No. 11–1069, 2011 WL 3648284, at \*1 (D.Md. Aug. 11, 2011) (noting that the bankruptcy court had modified the automatic stay in part because the claims "involved issues of Virginia law better suited for resolution by the Virginia district judge who had invested substantial time in the case"); *Ewald*, 298 B.R. at 81 ("Modifying the stay promotes judicial economy ... as the state court is familiar with the facts and circumstances of the claims asserted as they have been pending there for almost three years.").

Further, the orders the Master–in–Equity has entered on the Junks' claims against third-party defendants and their counterclaims against CitiMortgage are inconsistent with certain positions the Junks are taking in this adversary proceeding. For example, the Junks contend in the Complaint that CitiMortgage's claims are barred by the lack of response to the Junks' notice of rescission. J.E. 46 ¶¶ 207–15. Yet in his order dismissing the counterclaims against CitiMortgage the Master–in–Equity ruled that the Junks failed to make a timely rescission demand. J.E. 22 at 10. The Junks also continue to argue that it is necessary to join the numerous parties that were joined as defendants in the foreclosure action as defendants in this adversary proceeding in order to adjudicate the enforceability of the Note and the Mortgage. *See* Tr. at 90 (Mr. Brunner stating that "I also think that as part of that they're a necessary party to the declarations that we seek from the Court."); 109–10 (Mr. Brunner

stating that, in order to determine who the secured party is, the Junks need to name Lawyers Title, the entity that insured the title for the lender, as a defendant); 124–26 (Mr. Brunner stating that the Riley Pope Defendants are necessary parties because they have asserted that their client was a holder in due course of the Note); 266 (Mr. Brunner stating that all of the parties are not before the Master–in–Equity that are necessary to determine whether a debt to CitiMortgage exists and whether the debt is secured). But the Master–in–Equity effectively rejected this position when he dismissed the third-party complaint.

The Master–in–Equity's rulings are on appeal to the South Carolina Court of Appeals, which also has invested judicial resources in the litigation between the Junks and CitiMortgage. It is inconsistent with the goal of promoting judicial efficiency to ask this Court to make rulings on issues that a state trial court has already rejected and that are on appeal to an appellate court of that state. If litigants such as the Junks were permitted to litigate the enforceability of notes and mortgages in adversary proceedings rather than in pending state court proceedings under the circumstances present here, it would turn the entire process into a model of judicial inefficiency.

Granting relief from stay will promote judicial economy despite the concurrent pendency of the adversary proceeding and the state court foreclosure action. This Court stayed discovery in the adversary proceeding pending its decision on the Stay Relief Motion and the Dismissal/Abstention Motion. That stay will remain in place and the adversary proceeding will be held in abeyance until after the South Carolina courts enter final nonappealable orders on the issues of whether the Note and the Mortgage are enforceable and whether

reformation is permissible. Thus, there will be no need for activity in the adversary proceeding until after the Master–in–Equity's judgment in the foreclosure action becomes final and nonappealable.

■ Likewise, the need for estate administration during the pendency of the state court litigation will not lead to judicial inefficiency. The Junks have stated that they have no intention of attempting to formulate a Chapter 11 plan unless they can use funds obtained from a sale of the Oldfield property free of the lien of Citi-Mortgage. *See* Junk Objection to Stay Relief Mot. at 1, 9. Contending that there is a bona fide dispute as to CitiMortgage's interest in the Oldfield property, the Junks have filed a motion to sell it free and clear of CitiMortgage's interest (Doc. 64). In support of that motion they rely on § 363(f)(4) of the Bankruptcy Code, under which a trustee or debtor in possession may sell property outside the ordinary course of business pursuant to § 363(b) free and clear of liens if the liens are "in bona fide dispute[.]" 11 U.S.C. § 363(f)(4). Importantly, "§ 363(f)(4) ... does not require the court to resolve the dispute, just to determine its existence." *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 229 (Bankr.S.D.Ohio 2008) (internal quotation marks omitted).

The Junks' sale motion ("Sale Motion") (Doc. 71) proposes to sell the Oldfield property at a private sale to the individuals currently residing at the property. The proposed sale price is $645,000—significantly less than the $948,993 value for the Oldfield property that the Junks listed on their bankruptcy schedules, Sale Mot. at 2, and in a Real Property Questionnaire they filed in August 2013 ("Questionnaire")

(Doc. 23). In addition to identifying the fair market value of the property as $948,993, the Questionnaire also stated that "Friends of [the Junks] occupy property and maintain it[,]" but that there was no rental agreement. Questionnaire at 2. Mr. Junk signed the Questionnaire after stating that "I declare under penalty of perjury that the answers contained in the foregoing Real Property Questionnaire are true and correct to the best of my knowledge, information and belief. I have full authority to make the above answers on behalf of the debtor in possession." Questionnaire at 6.

CitiMortgage filed an objection to the Sale Motion on the grounds that the Oldfield property has not been marketed, the proposed sale is not an arm's-length transaction, and the proposed sale price is not reflective of the property's fair market value (Doc. 79). CitiMortgage stated that the Junks "intend to sell the [Oldfield property] to their self-described 'friends' who currently live in the [p]roperty and have been doing so for months and months, rent free." Doc. 79 at 2. Despite the statement made by Mr. Junk under penalty of perjury that the people occupying the property were the Junks' friends, in their response to CitiMortgage's objection (Doc. 83) the Junks suggested otherwise, stating that "[c]ontrary to the assertion of CitiMortgage that the tenants are 'friends' of the [Junks], the tenants agreed to live in and maintain the [p]roperty when the [Junks] vacated the same." Doc. 83 at 3 n.2. The Junks attempted to explain the lack of a rental agreement by stating that they were "unable to obtain approval of a rental agreement given that they were not current on their dues." *Id.*[26]

---

**26.** The Court takes judicial notice of the Questionnaire, the Sale Motion, the objection to the Sale Motion and the Junks' response only for the purpose of demonstrating that statements contained in those documents were made, not as a finding that such statements are true.

In analyzing an individual Chapter 11 debtor's motion to sell his or her real property, courts have applied the factors used to analyze a proposed sale of substantially all of a debtor's assets under § 363(b). *See In re Gregg*, No. 13–00665, 2014 WL 793126, at *3 (Bankr.D.S.C. Feb. 25, 2014). Under Sixth Circuit law, a bankruptcy court may approve a sale of all of a debtor's assets under § 363(b) "when a sound business purpose dictates such action." *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir.1986). During the hearing that the Court is prepared to set on the Sale Motion, the Court will consider the following factors when conducting the *Stephens Industries* analysis: whether the terms of the proposed sale reflect the highest and best offer for the assets, whether the negotiations were conducted at arm's length, and whether the sale is in the best interest of the estate and its creditors. It is only if the Junks establish that their proposed sale satisfies those factors that it will become necessary for the Court to determine whether the dispute between the Junks and CitiMortgage is bona fide. And if the Junks succeed in making the required showing under § 363(b), the Court is in a position to make the determination required by § 363(f)(4)—whether the dispute is bona fide, not who will prevail—without duplicating the Master–in–Equity's efforts to adjudicate whether the Note and the Mortgage are enforceable.

In short, the need for administration of the Junks' bankruptcy estates during the pendency of the South Carolina proceedings will not lead to judicial inefficiency. Instead, for all of the reasons explained above, granting relief from stay will promote the goal of judicial economy.

### b. Trial Readiness

Mr. Junk contends that the foreclosure action is not ready for trial because the pending state court appeals must be disposed of before the foreclosure action can continue. Tr. at 185; 189. Assuming this is true, the Junks created that situation by filing serial appeals. Tr. at 182–88. In the state court they appealed an order the appellate court later found to be unappealable and then appealed it once again, with the result being the same—the appeal was dismissed. They appealed the denial of a default judgment that the Master–in–Equity had denied as moot because he had already dismissed the third-party complaint on which the defendant had defaulted. They requested that the Master–in–Equity certify his ruling granting Colonial Coast's motion to set aside its default on the grounds that there was no prejudice to the Junks so that the Junks could appeal it immediately. Whether the pending appeals will be dismissed remains to be seen. In any event, the Junks have been indefatigable in their appeals and other attempts to slow down the foreclosure litigation in South Carolina, and they should not be rewarded for their dilatory tactics by moving the litigation to this Court. When given the opportunity, the Master–in–Equity has scheduled hearings in the foreclosure action as promptly as possible, and there is no reason to believe that he will not continue to do so once the foreclosure action is back before him.

The Court also finds the Junks' contention that they need more discovery in the foreclosure action before it is ready for trial to be an inadequate reason to deny relief from stay. Mr. Junk has made discovery requests that have been opposed and has received a commission to issue a subpoena outside South Carolina. Tr. at 173–74, 177–80; J.E. 45 (motion to quash by the Riley Pope Defendants). During the state court proceedings, counsel for Mrs. Junk stated that they had received some informal discovery. Once the fore-

closure action is back before him, the Master–in–Equity, not the Junks, will decide when the matter is ready for trial. Even if the foreclosure action is not quite ready for trial, "the fact that the lawsuit is not ready for trial in state court does not weigh either for or against granting relief because the lawsuit is not ready for trial" in this Court either. *In re Ramsey*, No. 10–16609, 2011 WL 2680575, at *3 (Bankr. N.D.Ohio July 7, 2011).

### c. Resolution of Preliminary Bankruptcy Issues/State Law Basis for Claims

Relief from stay is warranted because state law issues bearing on the enforceability of the Note and the Mortgage are the predominant issues in this adversary proceeding and need to be resolved before the Court will be in a position to address any bankruptcy issues.

### i. Enforceability of the Note Is an Issue in the State Court.

As an initial matter, the Court must address the Junks' contention that the issue of the enforceability of the Note is not even before the Master–in–Equity. They argue that because CitiMortgage has waived its right to a deficiency judgment, the state court action is one "to foreclose the purported mortgage only[,] not an action on the refinance promissory note[,]" Junk Opp'n to Stay Relief at 2, the suggestion being that the enforceability of the Note and whether the Junks have defaulted are not issues before the Master–in–Equity. To the contrary, notwithstanding the waiver of the deficiency, in order to order foreclosure, the Master–in–Equity must determine whether the Junks are in default of their obligations under the Note and whether CitiMortgage has the right to enforce it. This is because a plaintiff has no right to foreclose unless there has been a default under an enforceable note. *See Bank of America, N.A. v. Draper*, 405 S.C.

214, 746 S.E.2d 478, 481 (Ct.App.2013) ("[T]he party seeking foreclosure has the burden of establishing the existence of the debt and the mortgagor's default on that debt.") (internal quotation marks omitted). Indeed, the Junks themselves assert the unenforceability of the Note as a defense in the foreclosure action. And except in the case of a deceased mortgagor, "[n]o sale ... shall be valid to pass the title of the land mortgaged unless the debt for which the security is given shall be first established by the judgment of some court of competent jurisdiction." S.C.Code Ann. § 29–3–630 (2014). Further, the proceeds of any foreclosure sale would be payable to CitiMortgage only to the extent of the amount of CitiMortgage's claim against the Junks. Thus, before he could enter a foreclosure judgment, the Master–in–Equity would first need to adjudicate the enforceability of the Note, whether the Junks are in default, and any amount owed to CitiMortgage.

### ii. State Law Issues Predominate in the Adversary Proceeding.

The Junks make several arguments in an attempt to sidestep the conclusion that the primary issues in the adversary proceeding are state law issues bearing on the enforceability of the Note and the Mortgage. They go to great pains to paint the adversary proceeding as dominated by bankruptcy issues, beginning the Complaint with the statement that "[t]his is primarily an avoidance action." J.E. 46 ¶ 1. But despite sprinkling in a handful of references to § 544 throughout the Complaint, all of the relief sought by the Junks under the Bankruptcy Code is predicated on the purported unenforceability of the Note and the Mortgage under South Carolina law. Indeed, Count One of the Complaint seeks a declaratory judgment that the Mortgage is unenforceable because the Note is unenforceable. *See* J.E. 46 ¶ 365.

And the most recent filing the Junks made in the adversary proceeding is a document entitled Bench Memoranda on SC Code § 36–3–308, in which they contend that they "have standing to challenge the alleged indorsement on the refinance note as a forgery under South Carolina law" and that "absent negotiation[,] CitiMortgage is not a holder" of the Note under South Carolina law.

The Junks characterize the adversary proceeding as primarily a bankruptcy action to avoid the Mortgage under § 544 of the Bankruptcy Code. They have yet to explain, though, why there is any tenable basis for avoidance of the Mortgage under § 544 if it is enforceable. And if the Mortgage is unenforceable, some courts would see little if any reason to avoid it. *See Bostic v. Nat'l City Bank (In re DeRee)*, 403 B.R. 514, 524 (Bankr.S.D.Ohio 2009) ("[T]he Trustee is not required to avoid the liens held by NCB because as set forth above, the Court has found that NCB's mortgage liens do not encumber the Debtor's interest in the Property. Accordingly, there is nothing for the Trustee to avoid."); *Funches v. Household Fin. Consumer Discount Co. (In re Funches)*, 381 B.R. 471, 494 (Bankr.E.D.Pa.2008); *Myers v. Household Fin. Corp. (In re Myers)*, 262 B.R. 445, 448 (Bankr.N.D.Ind.2001). At least one court has found that the unenforceability of a note provides a basis to avoid the associated mortgage pursuant to § 544(a)(1). *See Rogan v. Vanderbilt Mortg. & Fin., Inc. (In re Dorsey)*, No. 13–8036, 2014 WL 888917, at *5 (6th Cir. BAP Mar. 7, 2014).[27] Practically speaking, though, it probably does not matter which view is correct. If the Master–in–Equity were to enter a judgment holding that the Note and the Mortgage are unenforceable

by CitiMortgage, and if that judgment became final and nonappealable, then there would be nothing for CitiMortgage to gain from opposing a request by the Junks to avoid the Mortgage. Therefore, as the bankruptcy court in Dorsey stated, in cases where the enforceability of a note is at issue, § 544 should not be the focus; instead, "[t]he true concern is the right of [the alleged mortgagee] to enforce the Note" under applicable state law. *Rogan v. Vanderbilt Mortg. & Fin., Inc. (In re Dorsey)*, 491 B.R. 464, 469 (Bankr.E.D.Ky. 2013), *aff'd*, 2014 WL 888917, at *7. The enforceability of the Note and the Mortgage are the primary issues in the state court and in this adversary proceeding.

The Junks rely on *Dorsey* in support of their objection to CitiMortgage's request for relief from stay. In so doing, they contend that they "have consistently taken the position that CitiMortgage, Inc., like Vanderbilt Mortgage and Finance, Inc., is not entitled to enforce the promissory note that is allegedly secured by a mortgage against the Debtors' real estate, and, accordingly, the mortgage is unenforceable." *See* Doc. 89 at 2. It is true that the Junks have consistently taken that position—including during the years spent litigating in South Carolina. Nothing in the decisions rendered by the *Dorsey* courts, however, suggests that a bankruptcy court rather than the state court should decide whether a note and mortgage are enforceable when there is a long-pending state court proceeding in which the issue of enforceability can be decided. Indeed, in *Dorsey* no party was seeking relief from stay to litigate the enforceability of the note and mortgage outside the bankruptcy court; the *Dorsey* decisions do not even mention

---

**27.** In *Dorsey*, the note at issue did not contain any indorsements. *See Dorsey*, 2014 WL 888917, at *3 n. 4.

whether there were any pending state court proceedings.

### iii. State Law Issues Must Be Resolved First.

The reason these state law issues predominate and must be determined first is that they will have bearing on other relief sought by the Junks in this adversary proceeding. For example, it is only after the Master–in–Equity finally adjudicates the foreclosure action that the Court will be in a position to hear the Junks' objection to CitiMortgage's proof of claim. The Junks object to the proof of claim on the basis that CitiMortgage has waived its right to a deficiency judgment. But South Carolina law contemplates a deficiency judgment for the amount "that may remain unsatisfied after a sale of the mortgage premises[,]" S.C.Code Ann. § 29–3–660, suggesting that the waiver of the deficiency is irrelevant if there is never a foreclosure sale. *See Quintana v. Comm'r (In re Quintana)*, 915 F.2d 513, 516 (9th Cir.1990) ("Creditor's waiver of its right to a deficiency judgment was not yet of relevance. Only after the actual sale, should the sale proceeds fail to satisfy the full $1,527,861.89 indebtedness plus costs, will Creditor's waiver have relevance."). Thus, the Court will be in a position to reduce the amount of CitiMortgage's proof of claim on the basis that CitiMortgage has waived the deficiency only if a foreclosure sale occurs, which will happen only if the Master–in–Equity determines that the Note and the Mortgage are enforceable. Conversely, if the Master–in–Equity were to hold that the Note and the Mortgage are unenforceable, the Court would then be in a position to determine whether CitiMortgage should have an unsecured claim on any other basis. In *Dorsey*, for example, after the bankruptcy appellate panel

affirmed the bankruptcy court's ruling that Vanderbilt Mortgage could not enforce the note and mortgage, the bankruptcy court entered an agreed order granting Vanderbilt Mortgage an unsecured claim for the amount asserted in its proof of claim. *See* Case No. 11–30829, Doc. 55 (Bankr. E.D.Ky. Apr. 11, 2014).

In the adversary proceeding the Junks also seek disgorgement based on the unjust enrichment that certain of the defendants allegedly received and an accounting from those defendants in order to assess the extent of the alleged unjust enrichment. But the predicate for the alleged unjust enrichment is the unenforceability of the Note and the Mortgage—again, an issue the Master–in–Equity will address in the foreclosure action. If the Note and the Mortgage are determined to be enforceable, then there likely is no basis to impose liability on any defendant for unjust enrichment.[28] Under those circumstances, it almost certainly would be appropriate to dismiss the Complaint for unjust enrichment and an accounting.

Thus, although the Junks seek avoidance of the Mortgage under 11 U.S.C. § 544, preservation of the mortgage lien under § 551, recovery of property under § 550 and a determination that CitiMortgage has no secured claim under § 506, the primary issues in this adversary proceeding relate to the enforceability of the Note and the Mortgage, issues that will determine the viability of the other counts of the adversary proceeding. Thus, this case is similar to another one in which a bankruptcy court granted relief from stay to permit state court litigation to continue. *See Ewald*, 298 B.R. at 81. In *Ewald*, the bankruptcy court granted relief from stay to permit

---

**28.** The defendants make other arguments for why they have no liability to the Junks. The Court takes no position on those arguments at this time.

state court litigation to continue after finding that "[t]he conclusion of the state court litigation will assist with the administration of debtor's bankruptcy case as the amount of any claim by debtor against NCMC, the validity and priority of NCMC's deed of trust, and the amount of NCMC's claims asserted in its cross-bill against debtor will be certain." *Id.* Just so here once the Master–in–Equity enters a final, nonappealable judgment in the foreclosure action. In sum, state law issues bearing on the enforceability of the Note and the Mortgage are the primary issues on which everything else in this adversary proceeding turns.

### d. The Creditor's Chance of Success on the Merits

The Court takes no position on CitiMortgage's chance of success on the merits. Again, nothing in this order should be construed as a finding of fact or conclusion of law on matters to be heard and decided by the Master–in–Equity.

### e. Cost of Defense to the Bankruptcy Estate/ Impact of Litigation on Other Creditors

No documentary or testimonial evidence was presented regarding the costs to the bankruptcy estate or impact of litigating in South Carolina on other creditors. During argument, though, Mr. Brunner pointed out that his law firm has agreed to represent the Junks on a contingency-fee basis, but only in the adversary proceeding, not in the South Carolina state courts. He argued that it would be unfair to expect the Brunner firm to seek Court authority to represent the Junks on a contingency-fee basis in the South Carolina state court system. Tr. at 276. Pointing to the Brunner firm's costs of travel from Columbus, Ohio to Beaufort County, South Carolina, Tr. at 61, he also argued that it would be a "hardship" for the litigation to continue in South Carolina because the Junks "would

have to hire counsel in South Carolina." Tr. at 48. In short, the Junks contend that it would be more expensive to litigate in South Carolina and that the estate cannot afford it. Tr. at 277. The Court rejects this as a basis for declining to grant relief from stay for several reasons.

First, while the Brunner firm is certainly free to decline to represent the Junks in South Carolina on a contingency-fee basis, the Court finds the arguments that Mr. Brunner made during the hearing for why the firm could not do so to be unpersuasive. Mr. Brunner argued that the firm could not represent the Junks on a contingency-fee basis in South Carolina because there is no contingency fee to be earned from merely defending a foreclosure action. Tr. at 276. True, but defending the foreclosure action is not all that remains pending in South Carolina. There also are the Junks' appeals of the dismissal of their third-party claims and their counterclaims against CitiMortgage. It is the third-party claims and the counterclaims that, if successful, would generate funds to pay a contingency fee. Moreover, there appears to be no way the Junks could be successful on those claims unless they first successfully defend against CitiMortgage's assertion that it can enforce the Note and the Mortgage. In other words, successfully defending the foreclosure action is a prerequisite to any possible recovery on the third-party claims and counterclaims asserted in the state court, just as successfully establishing in this Court that the Note and the Mortgage are unenforceable would be a necessary prerequisite to a possible monetary recovery from the numerous defendants the Junks have named in this adversary proceeding. In short, the potential for a contingency fee is no less available from litigating in South Carolina than it is available from litigating in this Court.

Second, if the Junks want the Brunner firm to represent them in South Carolina and the Brunner firm agrees to do so but is unwilling to advance the costs of litigating there, and if the Junks believe that they do not currently have the means to advance those costs, then they will need to adjust their lifestyle. The evidence presented at the hearing showed that Mr. Junk lost two jobs after moving to Columbus while spending a considerable amount of time on the litigation with CitiMortgage, including time spent traveling to and attending hearings in South Carolina and drafting documents for filing with the South Carolina courts. Those are not, at least as of this time, income-producing activities. Mr. Junk, therefore, may need to obtain employment or other sources of income. In addition, the Junks could reduce their expenses. Among other things, they currently are living in Columbus and presumably incurring housing costs here even though they have a house in South Carolina—the Oldfield property—that they were living in rent and mortgage free from March 2009 until they moved to Columbus in August 2011.

■ Third, Mr. Brunner incorrectly argued that Mr. Junk, as a debtor in possession, is precluded from continuing to represent himself in the South Carolina litigation because he is unlicensed to practice law. As explained further below, as a debtor in possession, Mr. Junk has the rights and powers of a trustee. Trustees may represent themselves in Chapter 11 cases, *see Nicole Energy Servs.*, 385 B.R. at 221–22, as well as under other chapters of the Bankruptcy Code. Because they are representing themselves, they may do so even if they are not attorneys. Thus, Mr. Junk would not be prohibited from repre-

senting himself merely because he is not a licensed attorney. He testified that he represented himself prior to the bankruptcy as a cost-savings measure, and there is no reason from a bankruptcy-law perspective that he cannot continue to do so. The only thing he is not entitled to is compensation for representing himself. *See* 11 U.S.C. § 1107(a) (providing that debtors in possession "have all the rights, other than the right to compensation under section 330 of this title, and powers ... of a trustee serving in a case under this chapter").

Fourth, while the Junks had every right to move from South Carolina to Ohio, they do not have the right to impose the cost of that move on the judicial system. A foreclosure defendant who moves to a new state and then commences a bankruptcy case there does not have the right to litigate the enforceability of a note and mortgage in the bankruptcy court merely because it would be more expensive for him or her to litigate the issues in the state court—especially when the state court has already invested significant resources in a case that has been pending for several years. Otherwise, the foreclosure defendant essentially would be making judicial inefficiency one of the costs of his or her move. The Junks should not be permitted to impose that cost on the judicial system merely because they have been able to retain a law firm that apparently is willing to represent them on a contingency-fee basis in this Court while being unwilling to do so in the state courts of South Carolina.[29]

Moreover, there should be either no or a relatively small cost to creditors of litigating the enforceability of the Note and the Mortgage in South Carolina. Again, the

---

**29.** By way of explanation, the Court notes that Mr. Brunner is Mr. Junk's brother-in-law and that another partner in the Brunner firm is Mr. Junk's sister. *See* Amended Application of Debtors for Authority to Employ Brunner Quinn as Special Counsel (Doc. 21).

Junks have stated that they intend to propose a Chapter 11 plan only if they are able to fund the plan with proceeds of the sale of the Oldfield property free of the lien of CitiMortgage, leaving CitiMortgage with no lien on the proceeds (and, the Junks argue, no claim at all). That will not happen if the South Carolina state courts determine that the Note and the Mortgage are enforceable by CitiMortgage. Under that outcome, there would be no Chapter 11 plan and no distribution to creditors in Chapter 11. The effect on those creditors—not being paid—would be the same whether the Junks litigated in bankruptcy court at a lower cost or spent more litigating in state court. And there should be little negative effect on creditors of litigating in South Carolina under the converse scenario where the South Carolina state courts determine that the Note and the Mortgage are unenforceable by CitiMortgage, leaving CitiMortgage with no lien on the proceeds of a sale. Under that scenario, the funds available from a sale with which to pay unsecured creditors might be reduced by administrative expenses incurred by professionals retained by the estate to litigate in South Carolina. Those expenses, though, are likely to be relatively small when compared to the benefit derived from successful litigation. Furthermore, those expenses would not outweigh the costs to judicial efficiency that would be imposed by permitting the Junks to litigate the enforceability of the Note and the Mortgage in this Court.

### 6. Conclusion Regarding Relief from Stay

While imposing either no or relatively minimal costs on creditors and the estate, granting relief from the automatic stay will promote judicial economy by permitting the court in which the Junks and CitiMortgage have been litigating for several years to adjudicate the state law issues on which this adversary proceeding and bankruptcy case turn. In sum, application of the relevant factors leads to the conclusion that relief from stay should be granted.

## C. Permissive Abstention

Of course, it makes sense to grant relief from stay only if the Court also abstains from deciding the issues that will be decided by the state court. Those issues are (1) whether the Note and the Mortgage are enforceable by CitiMortgage and (2) whether reformation of the Mortgage would be effective against a judicial lien creditor or a bona fide purchaser of real property under South Carolina law.

■ The basis for abstention lies in § 1334(c)(1) of the Judicial Code, which states:

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1). Under this statute, a court may abstain in the interest of justice, or in the interest of comity with state courts or respect for state law. This is known as permissive abstention. Courts analyze several factors when determining whether those interests warrant permissive abstention:

> In considering whether to exercise permissive abstention, courts consider numerous factors[,] including: (1) the effect or lack of effect on the efficient administration of the estate if a court abstains, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the

presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted core proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden on this court's docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, (12) the presence in the proceeding of nondebtor parties and (13) any unusual or other significant factors.

*Meritage Homes Corp. v. JPMorgan Chase Bank, N.A.*, 474 B.R. 526, 573 (Bankr.S.D.Ohio 2012) (internal quotation marks omitted).

■ The standard that bankruptcy courts apply in determining whether to abstain from hearing a matter "is a multi-factor balancing test, not a rule in which every element must be satisfied; not all factors need to weigh in favor of permissive abstention in order for it to be appropriate." *Johnston v. City of Middletown (In re Johnston)*, 484 B.R. 698, 714–15 (Bankr.S.D.Ohio 2012). "Further, the relevance and importance of each of these factors will vary with the particular circumstances of each case and no one factor is necessarily determinative." *Id.* at 715. Applying the relevant factors here, the Court concludes that it is appropriate to abstain from hearing the adversary proceeding to the extent it seeks an adjudication of issues to be decided by the South Carolina state courts.

### 1. Effect on the Efficient Administration of the Estate

■ The Court finds that the first factor—whether abstention will have an effect on the efficient administration of the bankruptcy estate—supports abstention. As discussed above, the Junks have represented to the Court that they will be able to propose a Chapter 11 plan only if they are successful in their litigation with Citi-Mortgage. In the meantime, they seek to sell the Oldfield property free and clear of CitiMortgage's asserted lien pursuant to § 363(f)(4). But, as also discussed above, the Junks must first make the required showing under § 363(b), and if they succeed in doing so the Court may still conduct the § 363(f)(4) analysis without duplicating the Master–in–Equity's efforts.

If it has any effect at all, abstention likely will have a positive effect on the efficient administration of the estate. The manner in which the estate is administered depends on how the issues of the enforceability of the Note and the Mortgage are resolved. The Master–in–Equity's handling of the foreclosure action to date suggests that he will efficiently adjudicate those issues once they are back before him. This Court would adjudicate the issues no more efficiently, and possibly less so given its unfamiliarity with South Carolina law. Further, there is no reason to believe that the appellate process would take less time in the federal courts than in the state courts of South Carolina. The effect that abstaining will have on the efficient administration of the estate weighs in favor of abstention.

### 2. Predominance of Unsettled State Law Issues/Presence of a Related Proceeding Commenced in State Court

The predominance of unsettled state law issues also supports abstention. As ex-

plained above, state law issues strongly predominate over bankruptcy issues. Not only that, but those issues are ones that South Carolina has a strong interest in deciding. *See Blake v. Wells Fargo Bank, N.A.*, 917 F.Supp.2d 732, 738 (S.D.Ohio 2013) ("[A] state foreclosure matter implicates important state interests."); *Whittington v. U.S. Bank Nat'l Ass'n*, No. 4:12–CV–03167, 2013 WL 2285943, at *12 (D.S.C. May 23, 2013) ("[T]here is undoubtedly an important state interest in adjudicating foreclosure matters pertaining to real property located within a state."); *Sergeon v. Home Loan Center, Inc.*, No. 09–01113, 2010 WL 5662930, at *4 (M.D.Fla. Oct. 26, 2010) ("Many courts have recognized that state mortgage foreclosure actions implicate important state interests."), *adopted by*, 2011 WL 308176 (Jan. 27, 2011).[30] *See also Lee v. Anasti (In re Lee)*, 461 Fed.Appx. 227, 232 (4th Cir.2012) ("The state court litigation involved only issues of state real property law, rendering the expertise of the bankruptcy court unnecessary. Notably, real property law is an area in which federal courts are especially deferential to state courts.").

The unsettled nature of some of the state law issues also weighs in favor of abstention. In fact, "the primary determinant for the exercise of discretionary abstention is whether there exist[ ] unsettled questions of state law." *Lindsey v. Dow Chem. Co. (In re Dow Corning Corp.)*, 113 F.3d 565, 571 (6th Cir.1997) (internal quotation marks omitted). That makes sense, because this Court is as able as the state courts of South Carolina to apply the plain language of a statute or a holding of a controlling decision that is squarely on

point to the facts of a case. For example, Mr. Junk contends that he used a blue pen and his wife a black one to execute the Note and recalls asking "Andrea Easler if that was a problem and she told me, no, that would be fine." Tr. at 159. If one assumes that the color of ink was relevant—that, for example, a South Carolina statute provided that "notes are enforceable only if they are signed in the same color ink by each of the persons executing them"—and also assumes that it is true that Mr. Junk used a blue pen and his wife a black one, then there might be little reason to abstain simply to allow the South Carolina courts to hold that the Note is unenforceable based on the failure to use the same color inks. But that is not the nature of the state law issues bearing on the enforceability of the Note and the Mortgage. Those issues are significant and at least some of them appear to be unsettled in South Carolina.

A brief survey of the state law issues illustrates their significance and unsettled nature. Both in state court and here the Junks contend that the signatures of Danielle Sterling on the Note's indorsements were forged. *See* Junk Opp'n to Stay Relief at 8. They also allege fraud related to the mortgage assignments. *See id.* at 6; Ex. 2 to J.E. 46 ¶ 27 (Aff. of Lynn E. Szymoniak stating that "I have concluded that the Assignments at issue herein are fraudulent and/or insufficient to establish standing to foreclose."). Given the choice between the courts of South Carolina and a bankruptcy court in Ohio, it is the South Carolina courts that should determine the important issue of whether signatures on indorsements were forgeries and whether

---

**30.** *See also Krasnov v. RBS Citizens, N.A.*, No 12–2650, 2013 WL 526889, at *4 (N.D.Ohio Feb. 8, 2013) (abstaining from interference with state court foreclosure proceeding because "it is well-established that resolution of

foreclosure and property actions implicate important state interests."); *Bryant v. Citimortgage*, No. 10–1206, 2010 WL 3220331, at *1 (M.D.Fla. Aug. 13, 2010) (same).

other documents were fraudulent. *See Bucano v. Sibum,* No. 12–606, 2013 WL 2456009, at *39 (M.D.Pa. June 6, 2013) ("The state court appeals proceedings clearly implicate important state interests because the state has a legitimate governmental interest in preventing insurance fraud...."); *Hillhouse v. U.S. Dep't of Treasury,* No. 12–97, 2012 WL 3929893, at *3 (E.D.Ark. Sept. 7, 2012) ("Enforcing Arkansas's securities laws and protecting citizens from fraud are important state interests."), *aff'd sub nom. Graddy v. U.S. Dep't of Homeland Sec.,* 515 Fed. Appx. 625 (8th Cir.2013); *Christian Action Network v. Maine,* 679 F.Supp.2d 140, 145 (D.Me.2010) ("[T]he hearing implicated the State's important interest in protecting its citizens against fraud and deceptive business practices.").

There is a split of authority on other disputed issues in the state court foreclosure action, including issues raised by the involvement of MERS. Indeed, "[t]here has been a wave of litigation in state and federal courts challenging various aspects of the MERS System." *In re Mortg. Elec. Registration Sys., Inc.,* No. 11–17615, 2014 WL 2611314, at *3 (9th Cir. June 12, 2014) ("*MERS* "). "The results under state law have been inconsistent.... Federal courts, applying state law, have reached similarly disparate results." *Id.* In fact, the Ninth Circuit's decision in *MERS* illustrates the reason abstention is the appropriate course of action here. In *MERS,* the Multidistrict Litigation Court ("MDL Court") concluded that dismissal of one of the counts of the lawsuit was appropriate based on plausible arguments under an Arizona statute, but the Ninth Circuit concluded that subsequent decisions by Arizona appellate courts "have made clear that the MDL Court was incorrect in rely-

ing on [those arguments]." *Id.* at *7. Federal courts, of course, make predictions about how state appellate courts would rule on unsettled state law issues, especially when there are no pending state court actions to which the federal courts may defer. But where there is a pending state court action, the better course is to abstain to permit the state court to address the unsettled issues rather than trying to predict how the state court would rule.

One of the MERS-related issues on which courts across the country are divided is whether MERS may assign a note despite having no interest in it. *Compare Taylor v. Deutsche Bank Nat'l Trust Co.,* 44 So.3d 618, 623 (Fla.Dist.Ct.App.2010) ("[T]he written assignment of the note and mortgage from MERS to Deutsche Bank properly transferred the note and mortgage.... The transfer, moreover, was not defective by reason of the fact that MERS lacked a beneficial ownership interest in the note at the time of the assignment, because MERS was lawfully acting in the place of the holder and was given explicit and agreed upon authority to make just such an assignment."),[31] *and Tilley v. Ampro Mortg.,* No. S–11–1134, 2012 WL 33033, at *3 (E.D.Cal. Jan. 6, 2012) (holding that MERS had authority to assign a note as agent for the lender), *with Thomas v. CitiMortgage, Inc. (In re Thomas),* 447 B.R. 402, 412 (Bankr.D.Mass.2011) ("CitiMortgage may not rely on the recorded assignment of the plaintiff's mortgage from MERS to CitiMortgage as evidence that the note was transferred to it. While the assignment purports to assign both the mortgage and the note, MERS, which is a registry system that tracks the beneficial ownership and servicing of mortgages, was never the holder of the note, and therefore lacked the right to assign it."), *and CPT*

---

**31.** *See also Wolf v. Fed. Nat'l Mortg. Ass'n,* 512 Fed.Appx. 336, 342 (4th Cir.2013) (hold-ing that borrower had no standing to challenge assignment of a note by MERS).

*Asset Backed Certificates, Series 2004–EC1 v. Kham,* 278 P.3d 586, 592 (Okla. 2012) ("There is nothing in the record to demonstrate MERS had any authority to assign the note to Appellee although, arguably, it had authority to assign the mortgage. Assignment of the mortgage, however, does not assign the note.").[32] The Junks argue that a note assignment by MERS is invalid. As far as the Court is aware, no South Carolina state court has addressed the issue.

The Junks also contend that the Mortgage is invalid because American Home Mortgage was never a member of the MERS electronic mortgage registration system. Other courts have rejected this argument. *See Faulconer v. Mortg. Elec. Registration Sys., Inc.,* No. 5:12–CV–246, 2014 WL 583006, at *1 n. 2 (M.D.Ga. Feb.

13, 2014) ("The Plaintiff argues that Home America was not a member of MERS and had no relationship to MERS, and therefore MERS could not be Home America's nominee.... This does not follow, however, as the Security Deed expressly names MERS as nominee for Home America."); *Wellington v. Mortg. Elec. Registrations Sys., Inc.,* No. 12–00541, 2012 WL 5378231, at *2 (D.Nev. Oct. 30, 2012). The Court, though, is unaware of any South Carolina statutes or decisions that address this point. The Junks further argue that the securitization process somehow rendered the Note and the Mortgage unenforceable. This argument has been rejected by several courts, see *Lewis v. Wells Fargo Bank, N.A.,* 939 F.Supp.2d 634, 638–39 (N.D.Tex. 2013) (citing cases),[33] but has not yet been addressed by a South Carolina court.[34]

---

**32.** CitiMortgage also contends that a note issuer lacks standing to challenge the indorsement on a note. Without deciding the issue, the Court observes that in those cases where the party attempting to enforce the note is relying on a purportedly valid indorsement, it makes sense that the issuer may challenge the indorsement. CitiMortgage relies on two decisions for its argument that issuers lack standing to challenge indorsements. *See* Doc. 90 at 7 n.35. The two decisions are *Pak v. Aurora Loan Servs. LLC (In re Pak),* No. 11–1108, 2011 WL 7145763, at *1 n. 4 (9th Cir. BAP Dec. 14, 2011) and *U.S. Bank Nat'l Ass'n v. Gregory,* No. CV085003721S, 2009 WL 1175622 (Conn.Super.Ct. Apr. 6, 2009). Neither decision supports CitiMortgage's argument that issuers lack standing to challenge indorsements. In *Pak,* the court held that there was no "legitimate basis" for the challenge being made to the indorsement, but did not hold—or even address—whether note issuers have standing to challenge indorsements. *See Pak,* 2011 WL 7145763, at *1 n. 4. In *Gregory,* the defendants in a foreclosure action objected to the bank's motion for summary judgment on the basis that the note on which the bank was relying contained improper indorsements. The defendants lost, but only because the court concluded the indorsements were valid, not because the defendants lacked authority to challenge the in-

dorsements. *See Gregory,* 2009 WL 1175622, at *2.

**33.** *See also Suss v. JP Morgan Chase Bank, N.A.,* No. 09–1627, 2010 WL 2733097, at *5 (D.Md. July 9, 2010); *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.,* 263 P.3d 397, 401–03 (Utah Ct.App. 2011).

**34.** Although the Court does not decide the issue, the Court notes that the Junks' argument that the Note is unenforceable because it was split from the Mortgage appears to have no viability. *See Scheider v. Deutsche Bank Nat'l Trust Co.,* —— Fed.Appx. ——, ——, No. 13–1821, 2014 WL 2109810, at *4 (4th Cir. May 21, 2014) (discussing cases issued by the South Carolina Supreme Court and the South Carolina Court of Appeals). In *Scheider,* the Fourth Circuit stated: "If we permitted the split-the-note theory the Scheiders propose, there would be little reason for notes to exist in the first place, as [o]ne of the defining features of notes is their transferability. The idea that transferring a note would strip it from the security that gives it value and render the note largely worthless ... cannot be—and is not—the law." *Scheider,* —— Fed.Appx. at ——, 2014 WL 2109810, at *4 (citation and internal quotation marks omitted). *See also Midfirst Bank, SSB v. C.W.*

Although the Court could address the issues mentioned above—just as the federal courts did in the cases cited—it makes much more sense to permit the South Carolina state courts to do so given the pendency of the foreclosure action there. Thus, the presence of a related proceeding commenced in state court weighs heavily in favor of abstention. In the end, the answer the Master–in–Equity gives might be straightforward. It certainly is conceivable that he will rule that one or both of the indorsements on the Note are valid and that the Mortgage follows the Note, making the Note enforceable by CitiMortgage; it also is possible that he will find the chain of assignments from MERS to Bayview to CitiMortgage to be valid.[35] But given that there is a pending state court action in which the relevant issues can be addressed—including whether the indorsements are valid or a forgery and whether the assignments were fraudulent—it is the South Carolina state courts that should conclusively address these issues.

### 3. Leaving Enforcement to this Court

Under circumstances like those present here, courts routinely direct that any foreclosure judgment obtained be enforced only after further relief from stay is granted for lack of adequate protection under § 362(d)(1) or under § 362(d)(2). The Court, therefore, directs that, if CitiMortgage obtains a foreclosure judgment, it shall seek and receive further relief from the automatic stay from this Court before executing on the judgment.

### 4. Forum Shopping

The evidence that the Junks were forum shopping when they commenced this adversary proceeding appears overwhelming. During the first hearing in the quiet title action and the foreclosure action, they consented to the Master–in–Equity's hearing the motions pending in those actions. The Junks, though, ultimately received several adverse orders from the Master–in–Equity. Mr. Barnes, counsel for Mrs. Junk, told the Master–in–Equity at one point

*Haynes & Co.*, 893 F.Supp. 1304, 1318 (D.S.C.1994) ("South Carolina recognizes the 'familiar and uncontroverted proposition' that 'the assignment of a note secured by a mortgage carries with it an assignment of the mortgage.' *Hahn v. Smith*, 157 S.C. 157, 154 S.E. 112 (1930); *Ballou v. Young*, 42 S.C. 170, 20 S.E. 84 (1894)."), *aff'd*, 87 F.3d 1308 (4th Cir.1996). Both in state court and here the Junks challenge the validity of the assignment of the Mortgage. One of the issues this raises is the right of a mortgagor to challenge a mortgage assignment, an issue on which there is a split of authority around the country. *See Culhane v. Aurora Loan Servs. of Neb.*, 708 F.3d 282, 289 (1st Cir.2013) (noting split of authority while holding that mortgagor has standing to challenge the assignment of a mortgage); *In re McFadden*, 471 B.R. 136, 161–62 (Bankr.D.S.C.2012) (holding that Chapter 7 trustee lacked standing to challenge mortgage assignment because the debtor into whose shoes the trustee stepped

lacked such standing but citing no South Carolina law). As far as the Court can tell, no South Carolina state court has addressed the issue. Then again, this issue might not be relevant given that, as the South Carolina authorities quoted above hold, the transfer of a note secured by a mortgage effectively transfers the mortgage.

**35.** *Cf. Scheider*, —— Fed.Appx. at ——, 2014 WL 2109810, at *4 ("South Carolina law thus settles the question.... [T]he note plainly constitutes a negotiable instrument under [South Carolina law]. That note was endorsed in blank, meaning it was bearer paper and enforceable by whoever possessed it. And [Deutsche Bank] possessed the note at the time it attempted to foreclose on the property. Therefore, once [the Scheiders] defaulted on the property, [South Carolina] law straightforwardly allowed [Deutsche Bank] to take the actions that it did.") (internal quotation marks omitted).

that "we have yet to survive a 12(b)(6) motion in this case and I can't—I don't think I pled it that badly, to be honest with you." J.E. 20 at 94:11–13. Multiple appeals of the Master–in–Equity's orders by the Junks ensued. The Junks have been no more successful in their appeals than they were before the Master–in–Equity. Most recently, before the Junks commenced their bankruptcy case, the South Carolina Supreme Court had denied certiorari on the South Carolina Court of Appeals' dismissal of the appeal of the Master–in–Equity's April 11, 2011 order. The Junks were still awaiting a ruling by the South Carolina Court of Appeals on their second attempt to appeal the April 11, 2011 order when they commenced their bankruptcy case. As noted above, that appeal was dismissed after the Petition Date but before the Junks commenced this adversary proceeding.

During the hearing, Mr. Brunner pointed out that the Junks "kept litigating the matter for nearly two years [in South Carolina after moving to Columbus] before filing and seeking protection in this Court." Tr. at 61. The suggestion seems to be that the fact that the Junks waited for a while after moving to Columbus to file the bankruptcy case and commence the adversary proceeding reflects that they were not forum shopping. The only thing that filing here sooner might have accomplished is making the indicia of forum shopping slightly more obvious, if that is possible.

In their Objection to Dismissal or Conversion, which the Junks incorporated by reference into their opposition to the Stay Relief Motion, the Junks stated the reason they filed their bankruptcy case:

[T]he Debtors made clear at their initial debtor interview with the Office of the United States Trustee, at the meeting of creditors conducted in this case, and at the hearing on the Objection of Citi-Mortgage to the Application of the Debtors to Employ Special Counsel, that this case was filed so that this Court can make a final determination as to the validity and priority of the asserted liens against the Property.

Objection to Dismissal or Conversion at 4.

Mr. Junk's own testimony confirmed his dissatisfaction with how things were going in South Carolina. Tr. at 211 ("I filed a quiet title. Nobody wants to come in on that. Then they filed a foreclosure action separately with, you know, a different party swearing different things, then they switched parties.... And then it's just escalated since then.").

In the adversary proceeding the Junks are making essentially the same arguments they were making in South Carolina in support of their position that the Note and the Mortgage are unenforceable. Further, the positions they are taking in this adversary proceeding are inconsistent with orders entered by the Master–in–Equity. Clearly unhappy with the results to date in South Carolina, the Junks commenced their bankruptcy case and this adversary proceeding with the apparent hope that this Court will reach conclusions contrary to those reached by the Master–in–Equity. But "concern that a party will lose its case does not demonstrate the inadequacy of a forum." *Bacardi Int'l Ltd. v. V. Suarez & Co.*, 719 F.3d 1, 16 (1st Cir.), *cert. denied,* —— U.S. ——, 134 S.Ct. 640, 187 L.Ed.2d 420 (2013). *See also Nakash v. Marciano*, 882 F.2d 1411, 1417 (9th Cir.1989) ("The final factor to consider is whether the second suit by Nakash is an attempt to forum shop or avoid adverse rulings by the state court. This factor weighs strongly in favor of abstention. Apparently, after three and one-half years, Nakash has become dissatisfied with the state court and now seeks a new forum for

their claims. We have no interest in encouraging this practice.") (citations omitted). And to "now allow [the debtor] to proceed with his Adversary Proceeding— which is merely a restatement, based on federal statutes, of the affirmative defense that he raised in his foreclosure proceeding—would encourage forum shopping." *Milian v. Wells Fargo & Co.*, 507 B.R. 386, 392 (S.D.Fla.2014). All in all, "the discomforting specter of forum-shopping[,]" *Bacardi*, 719 F.3d at 15 (internal quotation marks omitted), is a factor weighing strongly in favor of abstention here.

### 5. *RSM Richter, Inc. v. Behr Am., Inc.* Does Not Support the Junks' Position.

In support of their argument against abstention, the Junks rely on *RSM Richter, Inc. v. Behr America, Inc.*, 729 F.3d 553 (6th Cir.2013), in which the Sixth Circuit reversed a district court's decision to abstain. Tr. at 56–57. Although this adversary proceeding and *Richter* both involve abstention by a federal trial court in favor of state court litigation, the similarities end there. In *Richter*, Behr America, Inc. accepted aluminum that Aleris Aluminum Canada, L.P. had shipped to it under a requirements contract. Aleris, though, closed its plant and thus failed to send Behr an additional amount of aluminum required by the contract. Not having paid the $2.6 million due for the aluminum it did receive, Behr filed a lawsuit in a Michigan state court, contending that the plant closure and failure to ship the additional aluminum forced it to obtain aluminum from other suppliers, increasing its costs by $1.5 million beyond those it would have incurred if Aleris had fully performed under the requirements contract. When Behr commenced the state court lawsuit it named only the parent company of Aleris, not Aleris itself, as a defendant. Aleris then commenced a bankruptcy case in

Canada. It was not until three months after the bankruptcy filing that Behr amended its state court complaint to name Aleris as a defendant. In response, Aleris's bankruptcy trustee, RSM Richter, Inc.—relying on the automatic stay provision of Canadian bankruptcy law—sought and obtained an order from the Michigan state court staying Behr's $1.5 million lawsuit against Aleris. *See Richter*, 729 F.3d at 555.

Seeking to recover $2.6 million on account of Behr's failure to pay for the aluminum that Aleris had shipped, RSM, in its capacity as trustee of the estate of Aleris, commenced a lawsuit against Behr in a United States federal district court. Behr defended against the trustee's lawsuit by asserting a right of setoff for the $1.5 million of additional costs it allegedly incurred in using other suppliers to fulfill its requirements after the plant closure; Behr also filed a counterclaim for those costs. Behr, however, then requested that the federal district court abstain from hearing the entirety of the lawsuit in light of the pendency of the Michigan state court action. The district court granted the motion to abstain in part, deciding to hear Aleris's claim against Behr for the unpaid aluminum but not Behr's counterclaim for setoff based on the additional costs it had incurred. The counterclaim, the district court reasoned, was part and parcel of the claim Behr had asserted in the state court. *See id.*

With the setoff claim unadjudicated, the district also declined to decide Behr's setoff defense on the ground that it was duplicative of Behr's state court claim. Yet the district court granted summary judgment in favor of Aleris only in the amount of $1.1 million—the $2.6 million of unpaid aluminum minus the $1.5 million of extra costs Behr alleged it had incurred. The district court then closed the case, and

Behr paid the $1.1 million judgment. In the view of Aleris's trustee, the $1.1 million was $1.5 million short of what Aleris was due. So in an effort to obtain a ruling on the setoff issue, the trustee filed a motion to reopen Behr's state court case. But Behr opposed the motion to reopen, and the state court declined to reopen the case. *See id.* at 555–56. As the Sixth Circuit observed, because the district court had entered only a $1.1 million judgment against Behr, "adjudication of Behr's [setoff] claim would only cause *additional* funds to flow to the bankrupt estate, by requiring Behr to pay whatever monies it still owes to Aleris." *Id.* at 558. "That is presumably why Aleris has resolutely supported, and Behr has opposed, adjudication of Behr's own counterclaim [for setoff]." *Id.* With nowhere else to go to obtain an adjudication of the setoff issue, the trustee moved to reopen the federal district court case. The district court, though, denied the motion to reopen. As the Sixth Circuit noted, "[t]he practical effect of these decisions, state and federal, was to give Behr full value for its untested counterclaim." *Id.* at 556. The trustee appealed the district court's decision to the Sixth Circuit.

In reversing the district court and remanding the case for adjudication of Behr's setoff defense, the Sixth Circuit rejected the district court's rationale for abstention. The Sixth Circuit held that "the mere pendency of a state-court case concerning the same subject matter as a federal case is not reason enough to abstain." *Id.* at 557. "[T]he court's decision to abstain from one half of the parties' dispute only encourages piecemeal federal and state litigation—embodied here by the partial judgment [for $1.1 million]. That is a good reason for the court not to abstain." *Id.* at 558. "Nor does it generally seem a good idea to stay federal litigation in favor

of state litigation that is itself already stayed." *Id.*

None of this justifies the Junks' efforts to litigate the enforceability of the Note and the Mortgage in this adversary proceeding rather than in South Carolina. According to the time line set forth in *Richter,* Aleris had filed its bankruptcy case several months *before* Behr amended its complaint to add Aleris as a defendant in the Michigan state court lawsuit. Furthermore, after Behr finally named Aleris as a defendant the trustee obtained a stay of the litigation, suggesting that very little if anything could have been accomplished by the state court vis-a-vis Aleris. In other words, as the Sixth Circuit noted, the only potential reason for abstention in *Richter* was the *mere pendency* of the state court lawsuit, a reason that in and of itself is legally insufficient. By contrast, CitiMortgage's foreclosure action not only had been pending for several years in South Carolina before the Junks commenced their bankruptcy case, the South Carolina courts also had by then invested significant time and effort in hearing and deciding disputes between the Junks and CitiMortgage. Thus, unlike in *Richter,* the Court is abstaining based on much more than the mere pendency of a state court proceeding.

There are other important differences between this adversary proceeding and *Richter.* Unlike this Court's decision to abstain, the district court's decision to do so in *Richter* effectively prevented a party from having the opportunity to litigate a matter. The state court's refusal to reopen its case despite the district court's abstention and the district court's later denial of the motion to reopen its own case effectively prevented the Aleris trustee from obtaining a ruling on Behr's setoff defense and, therefore, from having the opportunity to recover the full $2.6 million

the trustee contended Behr owed Aleris. As the Sixth Circuit pointed out, the federal and state court decisions effectively gave Behr the benefit of the setoff defense without having to actually litigate it—and without the trustee having the opportunity to litigate it. But here the Court's decision to abstain does not prevent the parties from adjudicating any issue. To the contrary, abstention will permit the enforceability of the Note and the Mortgage to be determined by the courts of South Carolina.

Further, the district court's decision in *Richter* would have encouraged piecemeal federal and state litigation while this Court's abstention will not do so. If the state court in *Richter* had decided to reopen its case and had adjudicated the setoff issue, the result would have been a federal court decision on a claim for relief (Aleris's claim for Behr's nonpayment) and a state court decision on a counterclaim (Behr's counterclaim for Aleris's alleged failure to fulfill the terms of the requirements contract) that also was a defense to the federally-adjudicated claim. If that were permitted, it would encourage piecemeal federal and state court litigation—at least in cases where the party asserting a defense has lost or believes it will lose on a claim against it in federal court and foresees a better chance of prevailing on the defense in state court. But here the decision to abstain encourages nothing of the sort. The state courts of South Carolina will adjudicate CitiMortgage's foreclosure claim and in the process of doing so necessarily will adjudicate all of the Junks' defenses to foreclosure, including the purported unenforceability of the Note and the Mortgage. If the Court were to refuse to abstain under the circumstances of this case, it would encourage homeowners who are litigating quiet title and foreclosure actions in state court and who become unhappy with the results or anticipated results to commence a bankruptcy case in the hope that a federal court will see things differently.

Finally, *Richter's* statement that it does not "generally seem a good idea to stay federal litigation in favor of state litigation that is itself already stayed" does not support abstention under the circumstances of this adversary proceeding. As already discussed, the *Richter* court made this statement in an entirely different context than the one present here. At the time the district court in *Richter* abstained from deciding the setoff issue, the state court, in accordance with the automatic stay imposed by Canadian bankruptcy law, had stayed the lawsuit pending before it. Only the court presiding over the Canadian bankruptcy could have lifted the stay. Yet there was no mention in *Richter* of a request by Behr for relief from stay to pursue its state court action against Aleris. Not only that, but after the district court entered judgment against it for an amount that effectively gave it credit for the setoff, Behr—in an apparent effort to keep the setoff issue from being litigated—opposed the trustee's motion to reopen the state court case so that the trustee could obtain a ruling on the setoff issue. Here, by contrast, CitiMortgage is not attempting to prevent the Junks from litigating the issue of the enforceability of the Note and the Mortgage, but instead has filed a motion for relief from stay so that the issue can be litigated in the South Carolina state courts.

Understood in the context in which it was made, then, the statement from *Richter* quoted above clearly does not render the existence of the automatic stay in and of itself a reason to decline to abstain. If that were the law, by filing a bankruptcy case a party disappointed with the progress of state court litigation could give rise to both the automatic stay and at the same

time to an irrefutable argument that the stay should not be lifted. Rather than being the shield it is intended to be, the automatic stay would become a sword in the battle to determine where disputes should be litigated. For the reasons set forth above, the Court is abstaining from hearing the issues bearing on the enforceability of the Note and the Mortgage and granting relief from stay so that those issues may be adjudicated by the South Carolina courts.

### 6. Conclusion Regarding Abstention

In light of the foregoing, the Court concludes that in the interest of justice, in the interest of comity with the state courts of South Carolina and out of respect for the law of South Carolina, the Court should abstain from hearing the adversary proceeding to the extent it relates to the enforceability of the Note and the Mortgage and whether reformation would be effective against a judicial lien creditor and bona fide purchaser as of the Petition Date.

### D. The Junks' Authority to Participate in the State Court Litigation

The Junks begin their memorandum in opposition to the Dismissal/Abstention Motion (Adv. Doc. 261) by pointing out that they are debtors in possession. Adv. Doc. 261 at 1. They then refer to themselves as being their own predecessors in interest. They do so repeatedly. *See* Adv. Doc. 261 at 2; 3 n. 3; 5; 8; 9; 10; 13; 15; 16; 17; 18; 19; 20; 22; 29. Then, based on the distinction between their capacities prior to the Petition Date and afterward, the Junks argue that they "are not a party to the South Carolina action rendering abstention a legal impossibility." Adv. Doc. 261 at 29.

The Junks' argument is not well-taken. As debtors in possession, the Junks "have all the rights, other than the right to compensation under section 330 of this title, and powers ... of a trustee serving in a case under this chapter." 11 U.S.C. § 1107(a). Whenever relief from stay is granted to permit litigation to continue outside the bankruptcy court, a trustee certainly has the right and power to defend against that litigation, and if the trustee decides to do so, he or she may take the steps necessary to participate in the litigation. Debtors in possession likewise have the right and power to defend litigation that continues after relief from stay is granted. As debtors in possession, the Junks are authorized to participate in the litigation in the South Carolina state courts. Given that the Junks are the same persons before and after the Petition Date, it seems odd to suggest, as they do, that they would have to be substituted for themselves. Adv. Doc. 261 at 29 n.16.[36]

36. *Cf. Hays v. Cummins (In re Cummins)*, 174 B.R. 1005, 1009 (Bankr.W.D.Ark.1994) ("The debtor's continued identity crises, embodied in arguments that 'Larry Cummins' is a party in one action and 'Larry Cummins Debtor–in–Possession,' is a party in another action in no manner affects the application of the doctrines of res judicata and collateral estoppel. It is well-settled that the exact same parties are not required to be present in both cases in order for issues and causes of action to be precluded. It is sufficient if there is a 'substantial identity of the parties.' ... There is no question in this case that such a 'substantial identity' exists. While for Chapter 11 bankruptcy purposes there exists a distinction between an individual in bankruptcy and the 'debtor-in-possession,' there is no good faith basis for arguing that the distinction makes a difference for res judicata purposes. All of the acts and events described in the findings of facts entered by this Court concern and preclude Larry Cummins, or Larry Cummins Debtor–in–Possession, from re-litigating those facts. The fact that the state court suit is conducted by the debtor-in-possession, does not mean that a different person or individual performed the acts described in the bankrupt-

The South Carolina courts, though, have the authority to do whatever they believe is necessary to make the Junks parties to the proceedings in South Carolina in their capacities as debtors in possession.

As noted above, the South Carolina Court of Appeals has issued an order stating that "[w]e hold this appeal in abeyance pending notification that (1) the United States Bankruptcy Court has authorized either [the Junks] or their bankruptcy trustee to proceed with this appeal or (2) Appellants' bankruptcy action has been resolved." J.E. 31. There has been no trustee appointed in the Junks' Chapter 11 case. Instead, as debtors in possession, the Junks have the rights and powers of a trustee. To be clear, as debtors in possession, the Junks are authorized to participate in the litigation in the South Carolina state courts, including by proceeding with the pending appeal and pursuing any appeals that are filed in the future.

### E. Remainder of Adversary Proceeding Held in Abeyance

Because it is granting CitiMortgage's motion for abstention, it would not be appropriate for the Court to address CitiMortgage's motion to dismiss. *See Blake*, 917 F.Supp.2d at 739 ("In light of this Court's determination that ... abstention applies, it would be inappropriate for the Court to address the Rule 12(b)(6) branch of Wells Fargo's motion. Doing so would address the merits of Plaintiff's claims, which is inconsistent with abstention."). And because rulings that will be issued by the South Carolina state courts potentially will affect the counts of the adversary proceeding in which the Junks seek relief against parties other than CitiMortgage (e.g., for unjust enrichment and an accounting), it would not be an efficient use of judicial resources to decide the motions to dismiss by those other parties at this time. Instead, the appropriate approach is to hold the remainder of the proceeding in abeyance. *See Bacardi*, 719 F.3d at 16 ("In situations involving parallel state court litigation where deferring the exercise of jurisdiction is proper, this circuit has historically ordered a stay rather than a dismissal. Accordingly, we instruct the district court to stay these proceedings pending final disposition of the appellate process in the Puerto Rico courts.") (citation omitted). For those reasons, the Court holds the remainder of the adversary proceeding in abeyance.

### F. Stay of Discovery

■ "Trial courts have broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined." *Gettings v. Building Laborers Local 310 Fringe Benefits Fund*, 349 F.3d 300, 304 (6th Cir.2003). *See also Gilbert v. Ferry*, 401 F.3d 411, 415–416 (6th Cir.2005). As already discussed, a ruling by the South Carolina state courts as to the enforceability of the Note and the Mortgage and whether reformation would be effective against a judicial lien creditor and bona fide purchaser as of the Petition Date will determine the course of the rest of the adversary proceeding and the bankruptcy case. Accordingly, all discovery in the adversary proceeding is stayed and all discovery in the bankruptcy case also is stayed to the extent it relates to the enforceability of the Note and the Mortgage and whether reformation would be effective against a judicial lien creditor and bona fide purchaser as of the Petition Date.

---

cy court opinions. Both Larry Cummins and Larry Cummins Debtor–in–Possession are bound by the facts and law set forth in this court's opinions.").

## VI. Conclusion

For the reasons stated above, the Court **GRANTS** the Stay Relief Motion to permit CitiMortgage to pursue a foreclosure judgment (including by participating in the appellate process) and obtain, in connection with that judgment, a ruling by the South Carolina state courts as to the enforceability of the Note and the Mortgage and whether reformation would be effective against a judicial lien creditor and bona fide purchaser as of the Petition Date. CitiMortgage, however, shall not execute any judgment it obtains without requesting and obtaining further relief from the automatic stay from this Court pursuant to § 362(d)(1) (e.g., for lack of adequate protection) or pursuant to § 362(d)(2).

Consistent with granting relief from the stay, the Court **ABSTAINS** from hearing the adversary proceeding to the extent it relates to the enforceability of the Note and the Mortgage and whether reformation would be effective against a judicial lien creditor and bona fide purchaser as of the Petition Date.

Pending the conclusion of the proceedings in the South Carolina state courts by final nonappealable orders, the Court holds the remainder of the adversary proceeding in **ABEYANCE.** Discovery in the adversary proceeding shall be and hereby is **STAYED** during the pendency of the proceedings in South Carolina. Discovery in the bankruptcy case also is **STAYED** to the extent it relates to the enforceability of the Note and the Mortgage and whether reformation would be effective against a judicial lien creditor and bona fide purchaser as of the Petition Date.

As explained above, as debtors in possession, the Junks are authorized to participate in the foreclosure action as well as any appeals currently pending or to be filed in South Carolina.

CitiMortgage requests relief from compliance with the requirements of Rule 3002.1 of the Federal Rules of Bankruptcy Procedure. Because this rule by its terms applies only in Chapter 13 cases, Fed. R. Bankr.P. 3002.1(a), the request is **DENIED** as moot. As CitiMortgage also requested in the Stay Relief Motion, this Order shall not be stayed pursuant to Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure.

CitiMortgage and the Junks shall file a joint status report every three months during the pendency of the action in South Carolina and also shall file a joint status report once the foreclosure action has concluded with final, nonappealable orders.

**IT IS SO ORDERED.**